The MOVEMENT AGAINST DESTRUC-
TION et al.

v.

Richard H. TRAINOR, Chief, Interstate
Division, Baltimore City, et al.

Civ. A. No. M–74–666.

United States District Court,
D. Maryland.

March 17, 1975.

---

John C. Armor, Baltimore, Md., for plaintiffs.

Randy H. Lee, Asst. Atty. Gen., Baltimore, Md., and James R. Avnet, Sp. Atty., Interstate Div. for Baltimore City, Baltimore, Md., for defendant Richard H. Trainor, Chief, Interstate Division, Baltimore City.

Lawrence F. Rodowsky, Baltimore, Md., for defendant Mayor and City Council of Baltimore.

Ms. Jean G. Rogers, Asst. Regional Counsel, Federal Highway Administration, Region 3, Baltimore, Md., for defendant Claude Brinegar, Secretary, U. S. Dept. of Trans.

JAMES R. MILLER, Jr., District Judge.

## OPINION

This is the latest battle in the war currently being waged in the Baltimore area over the ultimate composition of its transportation system. The complaint was filed by two organizations, dedicated to preventing the construction of all or portions of the so-called "3–A System" of Federal-Aid highways in Baltimore City,[1] and by 11 individual citizens, residents and taxpayers of Baltimore City. The complaint was originally filed on June 26, 1974, against Richard H. Trainor, Chief, Interstate Divi-

---

1. For a complete description of the development of the "3–A System," see Movement Against Destruction v. Volpe, 361 F.Supp. 1360, 1366–1379 (D.Md.1973), aff'd 500 F.2d 29 (4th Cir. 1974).

sion for Baltimore City,[2] and the Mayor and City Council of Baltimore, seeking a preliminary and permanent injunction against the opening of bids for construction work on a portion of I–95 from Caton Avenue to Russell Street and other relief.[3] Since the bids on the Segment were scheduled to be opened on July 24, 1974, the court, at a conference with counsel, determined to bifurcate the issues presented by the complaint in order to have presented to it, with a minimum of required testimony, the facts and legal arguments on which the plaintiffs contended they were entitled to a preliminary injunction. A hearing was held on those issues and an opinion was announced thereon by the court on July 23, 1974, denying the requested preliminary injunction.

Thereafter, the complaint was amended to add Claude Brinegar, then Secretary of the U. S. Department of Transportation (USDoT), as a party defendant. In view of the public significance of the issues presented, an expedited schedule was established for preparation for trial on November 5, 1974. The court heard testimony and received evidence for two weeks[4] and heard final argument on December 20, 1974.

In general, the plaintiffs have contended in this proceeding that an injunction should be issued to prevent the construction of the Segment because (1) the Environmental Impact Statement (EIS) for the Segment was unlawfully approved, (2) the construction of the Segment is inconsistent with the approved State Implementation Plan (SIP) for attainment and maintenance of the air quality standards for the Baltimore air quality region, and (3) recertification of the "3–C Process"[5] for the Baltimore area was not made in accordance with applicable law.

### Background

The major thrust of the plaintiffs' contentions in this case is that a transportation systems study known as the Baltimore Regional Environmental Impact Study ("BREIS") is so technically inadequate as to be legally incapable of constituting the basis for reasoned decision making on the part of the responsible federal officials. BREIS was originally intended to address the potential regional air pollution impact which the Environmental Protection Agency (EPA) had identified as being a consequence of various transportation system alternatives in the Baltimore metropolitan area. It grew out of a "consensus" in September, 1972, between representatives of EPA and of the Federal Highway Administration (FHWA) in which it was agreed that no further PS&E approvals[6] would be granted by FHWA

2. The Interstate Division for Baltimore City (IDBC) is a division of the Maryland State Highway Administration (SHA) and was created, by agreement between SHA and the City, to manage the construction and completion of the Interstate System of highways in Baltimore. MAD v. Volpe, *supra*, at 1372.

3. Hereafter in this opinion the section of I–95 from Caton Avenue to Russell Street will be referred to as the "Segment."

4. Approximately 215 exhibits were received in evidence. Those exhibits, together with affidavits and approximately 1,200 pages of testimony, have been considered by the court. Both sides proposed findings of fact and submitted briefs.

5. Under 23 U.S.C. § 134(a) the Secretary of USDoT, or his delegate, is required to certi-

fy that highway programs are based on "a continuing, comprehensive transportation planning process carried on cooperatively by State and local communities . . .." This required planning process is known colloquially as the "3–C Process."

6. "PS&E approval" is required to be given by the Secretary of USDoT or his delegate of "surveys, plans, specifications, and estimates for each proposed [highway] project included in an approved program . . ." as one step in the statutory and regulatory scheme of the Federal-Air Highway Act in order that a highway may qualify for 90% federal funds as part of the "Interstate System." 23 U.S.C. § 101 et seq., particularly 23 U.S.C. § 106(a). *See* MAD v. Volpe, *supra*, 1367–1368, 1380–1383 for a discussion and exposition of the procedures under the Federal-Aid Highway Program.

for part of the "3–A Highway System" until a regional impact consideration statement had been prepared and circulated.[7] The study which grew out of the original consensus was expanded to supply general information of a regional nature to EPA, FHWA, and other state and federal agencies. It developed into a future planning tool for RPC[8] and other state agencies. Alan M. Voorhees Associates (AMV), a nationally known firm in the field of transportation planning and analysis, was engaged as the consultant to supervise the study. Data which were utilized in the study came from many sources, including RPC, Maryland DoT, BAQC, EPA, FHWA, and operating departments of Baltimore City. The initial AMV consulting work was authorized on February 5, 1973, for a maximum payment of $509,324. By December 27, 1973, an additional $111,574 had been authorized. The drafts of the seven basic technical reports comprising the BREIS study and the initial findings of the study were completed shortly prior to December 13, 1973.

The BREIS study purports to be an analysis of the environmental consequences of different transportation system alternatives for the region, particularly as the alternatives relate to socioeconomic impacts, VMT[9] impacts, air quality impacts, water quality impacts, noise impacts, and environmentally sensitive areas. The alternatives considered and the target years under study may be summarized as follows:

HIGHWAY ASSUMPTION

| YEAR | 3–A Interstate | Other Highways | RAPID TRANSIT ASSUMPTION |
|---|---|---|---|
| 1980 | Complete | Existing and Programmed | Phase I |
| 1980 | Partial | Existing and Programmed | Phase I |
| 1980 | Existing and under construction | Existing and Programmed | Phase I |
| 1995 | Complete | GDP[10] | GDP |
| 1995 | Existing and under construction | GDP | GDP |
| 1995 | Complete | Existing and under construction | GDP |
| 1995 | Existing and under construction | Existing and under construction | GDP |

———◆———

7. For the complete text of the "consensus," *see* 361 F.2d at 1377, fn. 37.

8. Regional Planning Council is a state agency serving the Baltimore metropolitan area.

9. VMT is an abbreviation for "vehicle miles traveled," a means of measuring the use of motor vehicles.

10. GDP refers to the General Development Plan for the Baltimore region, adopted on December 15, 1972, by the RPC following public hearings. The GDP includes the highway configuration know as the "3–A

The results of the initial study were reported in seven printed volumes, with a number of appendices. As a gross generalization, it may be said that BREIS concluded that there are economic benefits in the short term and long term from the construction of the 3–A highway system and of the other highway and rapid transit improvements contemplated by the GDP. It further concluded that by 1980 and 1995 projected pollutant levels in all categories of pollutants will differ only slightly among the transportation alternatives.

The basic seven-volume BREIS study has been supplemented by additional studies. A draft of BREIS Tech. Memo. No. 8, dealing with an analysis of energy consumption, was prepared in August of 1974. In late December, 1973, a study was authorized for assessing the interrelationship with BREIS of transportation control strategies promulgated by EPA on December 12, 1973, as a part of the SIP.[11] On September 18, 1974, AMV was awarded a contract to perform a traffic management study for the 3–A System in Baltimore.

On May 24, 1974, PS&E approval was given by FHWA for construction contracts relating to three portions of the Segment. On July 3, 1974, PS&E approval was given by FHWA for construction contracts relating to the fourth portion of the disputed Segment.

A list of the abbreviations used in this opinion appears as Appendix 6.

This opinion will constitute the court's findings of fact and conclusions of law.

### Scope of Review

There are three agency actions challenged in this proceeding. First is the determination by the Secretary, USDoT to approve the final EIS, as supplemented. This is a responsibility placed upon the Regional Administrator of FHWA by PPM 90–1, ¶ 6j [12] and upon the Secretary, USDoT, acting through the Assistant Secretary for Environment, Safety and Consumer Affairs, as required by USDoT Order 5610.1A, ¶ 8(*l*).[13]

The second agency action involved herein is the determination by the Regional Administrator, FHWA that the Segment was consistent with the SIP as required by 23 U.S.C. § 109(j) and 23 C.F.R. § 770.204(b)(3).

The third agency action challenged herein is the recertification of the "3–C Process" for Metropolitan Baltimore under 23 U.S.C. § 134(a) by the FHWA Regional Administrator as the delegate of the Secretary, USDoT.

[1, 2] A threshold question is whether the petitioners are entitled to any judicial review. The actions of officials of USDoT are subject to judicial review except where there is a statutory prohibition of review or where "agency action is committed to agency discretion by law." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 at 410, 91 S.Ct. 814, at 820, 28 L.Ed.2d 136 (1971); 5 U.S.C. § 701. There is no indication that Congress sought to prohibit judicial review of any of the questioned actions nor do they fall within the narrow exception "committed to agency discretion." Citizens to Preserve Overton Park v. Volpe, *supra*.

In reviewing the challenged actions, this court must engage in a substantial inquiry. The court must first determine whether the government officials whose actions are challenged followed the necessary procedural requirements in reaching and implementing their challenged decisions. Citizens to Preserve Overton Park v. Volpe, *supra*, 417, 91 S.Ct. 814; 5 U.S.C. § 706(2)(D). Secondly, the court must determine whether the governmental officials whose actions are challenged acted with-

---

System" within Baltimore City. It also includes a six-leg rapid rail transit system.

11. 38 F.R. 34247 et seq. (Dec. 12, 1973).

12. 23 C.F.R. 1, Appendix A; 37 F.R. 21809 (October 14, 1972).

13. 36 F.R. 23679 (October 4, 1971).

in the scope of their authority, that is, were their decisions within the range of choices they could legally make, did they properly construe the limits of their authority, and was there evidence before them sufficient to render it possible for them to have reasonably believed the actions they ultimately took were within the limits of their authority? Citizens to Preserve Overton Park v. Volpe, *supra*, 415–416, 91 S.Ct. 814; 5 U.S.C. § 706(2)(C). Lastly, the court must determine whether the decisions of the governmental officials involved were "arbitrary, capricious, or an abuse of discretion," that is, were the challenged decisions based upon a good faith consideration of the relevant factors and was there no clear error of judgment? Citizens to Preserve Overton Park v. Volpe, *supra*, at 416, 91 S.Ct. 814; 5 U.S.C. § 706(2)(A). While the reviewing court is not permitted to substitute its judgment for that of the agency, the ultimate standard of review being a narrow one, *Overton, supra*, at 416, 91 S.Ct. 814, the reviewing court has an obligation to review substantively agency decisions on the merits to determine "whether there has been a clear error of judgment." Conservation Council of North Carolina v. Froehlke, 473 F.2d 664 at 665 (4th Cir. 1973). *See also* Appalacian Power Co. v. Environmental Protection Agency, 477 F.2d 495, 506–507 (4th Cir. 1973).

*Discussion*

*Validity of Approval of EIS*

I

As previously noted, the first inquiry in determining the validity of agency action relating to the approval of the final EIS for I–95 from Caton Avenue to Russell Street (DX 96) is whether the proper procedures were followed. Since the plaintiffs have not challenged the validity of the "4(f)"[14] determination that there is no feasible or prudent alternative to use for construction of the Segment part of the park land compris-

ing Carrol Park, this aspect of the combined EIS and "4(f)" statement will not be considered herein.

The National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C) requires an EIS to be prepared for all ". . . major Federal actions significantly affecting the quality of the human environment . . . ." Among the areas to be covered by the EIS are "the environmental impact of the proposed action" (42 U.S.C. § 4332(2)(C)(i)) and the "alternatives to the proposed action" (42 U.S.C. § 4332(2)(C)(iii)).

Shortly after the adoption of NEPA, Congress passed the Clean Air Act of 1970, (P.L. 91–604, 84 Stat. 1676). A portion of that Act, now codified as 42 U.S.C. § 1857h–7, requires the EPA Administrator to review and comment in writing upon the environmental impact of any construction project for which an EIS is required under NEPA. In addition, the Federal-Aid Highway Act of 1970 (P.L. 91–605, 84 Stat. 1713) (now codified in part as 23 U.S.C. § 109(h) and § 109(j)) was enacted which required that the Secretary of USDoT develop and promulgate guidelines, in consultation with the Administrator of the EPA, "to assure that highways constructed pursuant to this title are consistent with any approved plan for the implementation of any ambient air quality standard for any air quality control region designated pursuant to the Clean Air Act as amended."

Under NEPA, each agency of the federal government is required to:

"identify and develop methods and procedures, in consulation with the Council on Environmental Quality established by subchapter II of this chapter, which will ensure that presently. unquantified environmental amenities and values may be given appropriate consideration in decision-making along with economic and technical considerations."[15]

---

14. Required by 49 U.S.C. § 1653(f), 23 U.S.C. § 138 and 16 U.S.C. § 470f.

15. 42 U.S.C. § 4332(2)(B).

Furthermore, NEPA provides that:

"All agencies of the Federal Government shall review their present statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of . . . [NEPA] and shall propose . . . such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this chapter." [16]

Based upon its mandate under NEPA and in specific response to the directives of Executive Order 11514,[17] the CEQ [18] published guidelines for federal agencies in the preparation of environmental impact statements. These guidelines, consistent with §§ 4332(2)(B) and 4333, placed the primary responsibility upon each individual federal agency to prepare its own NEPA procedures. (CEQ Guidelines, ¶ 3(a), 36 F.R. 4724 (1971)).

As a result, USDoT, in 1971, prepared its guidelines relating to the processing within its department of a final EIS, USDoT Order 5610.1A.[19] Paragraph 8l(1) requires that a final EIS, together with all comments which were received from the circulation of the draft EIS, be submitted to the Office of Environment and Urban Assistance (TEU) for USDoT for concurrence.[20] Paragraph 8l(2) provides that the final EIS will be considered concurred in by TEU unless notification to the contrary is sent out by TEU within two weeks. Upon concurrence, ¶ 8m provides that TEU is to send the final EIS to CEQ. Under ¶ 8n, no administrative action is to be taken sooner than 30 days after the final EIS has been sent to CEQ and has been made available to the public.

FHWA, on October 14, 1972, promulgated PPM 90–1 [21] as its response to the mandates of NEPA, Executive Order 11514, and the CEQ Guidelines that FHWA produce its own procedures for the preparation of environmental impact statements.[22] Under ¶ 6j of PPM 90–1, the Regional Administrator of FHWA is given the responsibility to act for FHWA in review and adoption of an EIS. Under ¶ 6p(2), a supplemental statement to an EIS is to be processed in the same manner as a new EIS.

In this case, the proposed final EIS on the disputed segment of I–95 was sent by the Division Office of FHWA to the Regional Administrator of FHWA on January 28, 1972. Over a year later, on April 13, 1973, the Regional Administrator of FHWA (Region 3) approved the final EIS and forwarded it to the Washington headquarters of FHWA. On April 16, 1973, the Washington headquarters forwarded the final EIS to USDoT. On September 19, 1973, TES approved the combination final EIS and "4(f)" statement. Thereafter it was forwarded to the General Counsel's office of USDoT for review.

On November 16, 1973, Interim Air Quality Guidelines (23 C.F.R. 770, 38 F.R. 31677) [23] were adopted by FHWA to comply with the mandate of the Federal Aid Highway Act of 1970. In § 770.204(b)(3) of those guidelines, provisions are made for the handling of highway projects where, as is the case

---

16. 42 U.S.C. § 4333.

17. 35 F.R. 4247 (March 4, 1970).

18. Counsel on Environmental Quality.

19. See footnote 13.

20. By USDoT N.110.37, the functions of TEU were transferred to TES, Assistant Secretary for Environment, Safety and Consumer Affairs on February 5, 1973.

21. See footnote 12.

22. PPM–90–1 also deals with FHWA procedures for implementing 49 U.S.C. § 1653(f), 16 U.S.C. § 470f, 23 U.S.C. § 138, and. 42 U.S.C. § 1857h–7.

23. Unless the context otherwise requires, all references herein to 23 C.F.R. § 770.200 et seq. refer to the Interim Air Quality Guidelines, rather than to the Final Air Quality Guidelines, 39 F.R. 44441 (12/24/74), adopted effective Dec. 26, 1974.

here, a final EIS had been approved by the Regional Administrator of FHWA before October 15, 1973 and grading and drainage authorization was requested after January 1, 1974. Subsection (i) of that section of the Interim Air Quality Guidelines requires that the FHWA Division Engineer, in those circumstances, consult with the state highway agency to review the final EIS to determine whether or not the discussion of air quality in the final EIS is adequate. If, upon such review, it is determined that additional information or analysis is necessary, subsection (ii) of the Interim Air Quality Guidelines provides:

" . . . a supplemental EIS shall be prepared and distributed for review and comment to appropriate local, State and Federal agencies with *expertise in air quality*. Thirty days shall be allowed for comment by interested agencies." (Emphasis supplied).

Subsection (iii) of the Interim Air Quality Guidelines further provides:

"Comments received shall be processed following the procedures outlined in PPM 90–1. Adoption of the supplement to the final EIS by the *Regional Federal Highway Administrator* shall be evidence of his positive finding on the consistency of the highway proposal with the State Implementation Plan." (Emphasis supplied).

While the combination final EIS and "4(f)" statement was under review in the General Counsel's office of USDoT and as a result of questions raised there, supplemental material to the final EIS was sent to USDoT to be formally included in the final document. Among the supplemental materials furnished was a summary of BREIS (Tech. Memo. No. 7) which had been previously circulated to EPA and to BAQC as well as to other interested agencies.

On March 29, 1974, the General Counsel's office of USDoT approved the combination final EIS and "4(f)" statement.

In the meantime, the Division Engineer of FHWA, in consultation with IDBC, Maryland DoT, Regional FHWA, and USDoT, upon review of the final EIS which had been prepared in large part over two years prior to that time, determined that additional information was necessary in the EIS discussion of air quality in order to comply with § 770.204(b)(3) of the Interim Air Quality Guidelines. AMV was engaged on March 7, 1974, to prepare an analysis of the effects of the subject segment of I–95 upon the level of CO [24] in the ambient air. The HC,[25] POX,[26] and NO$_2$[27] air quality studies had previously been performed by AMV as a part of the BREIS study. On April 22, 1974, the CO microscale analysis of AMV as well as Tech. Memo. No. 3 of BREIS, containing the mesoscale analysis of HC, POX, and NO$_2$, was sent to EPA and BAQC [28] as supplements to the final EIS for review and comment pursuant to the Interim Air Quality Guidelines, 23 C.F.R. § 770.-204(b)(3)(ii).

BAQC and EPA had had Tech. Memo. No. 3 in their possession since approximately December 13, 1973, as well as the Tech. Memos. of BREIS upon which Tech. Memo. No. 3 was in part based since at least that date. On January 7, 1974, and February 5, 1974, the EPA had previously commented to IDBC and FHWA upon Tech. Memo. No. 3. On January 15, 1974, March 27, 1974, and April 22, 1974, BAQC had made comments to IDBC and FHWA in reference to Tech. Memo. No. 3. As the result of one of the comments of BAQC on April 22, 1974, concerning Tech. Memo. No. 3, a change was made in Tech. Memo. No. 3 of which EPA was formally notified by letter dated May 7, 1974.[29] On February 19, 1974, the findings of the

24. Carbon monoxide.

25. Hydrocarbons.

26. Photochemical oxidants.

27. Nitrogen dioxide.

28. Bureau of Air Quality Control, a state agency.

29. See pp. 7 and 8, slip opinion MAD v. Trainor (Civil Action No. M–74–666) court's opinion dated July 23, 1974.

BREIS study were formally presented at a meeting in Washington, D.C., attended by representatives of USDoT, by Washington, Region 3 and Maryland Division representatives of FHWA, by representatives of the Washington Office and the Region 3 Office of EPA, and by representatives of BAQC.

With this background, BAQC and EPA, the applicable agencies with expertise in air quality, were given 30 days to comment upon the air quality supplement to the final EIS. 23 C.F.R. § 770.204(b)(3)(ii). On May 22, 1974, EPA, by telegram, stated that it found the Segment to be inconsistent with the SIP and followed up its telegram with detailed reasons on June 5, 1974. BAQC had indicated on May 23, 1974, that it would make no further comments on I–95 in reference to air quality in addition to those comments which it had already made, but on June 4, 1974, further written comments were made by BAQC on the air quality assessment of the Segment.

In the meantime Joseph Stackley, on behalf of the Division Engineer of FHWA, determined the subject segment of I–95 to be consistent with the SIP on May 23, 1974.

On June 10, 1974, a meeting took place at IDBC between representatives of IDBC, of AMV, and the Region 3 and Division offices of FHWA concerning the EPA comments of June 5, 1974. Based upon this meeting, the Division Engineer of FHWA reaffirmed the consistency determination which had previously been made by the division level. EPA and BAQC were so notified on June 11, 1974, and were furnished a copy of SHA's responses to the EPA comments of June 5, 1974. Pursuant to a request from the Regional Administrator of EPA, a meeting took place on June 18, 1974, with representatives of the Regional and Division offices of FHWA, and with representatives of IDBC, Maryland DoT, BAQC, and Baltimore City. As a result of that meeting, a memorandum of understanding was prepared dated June 28, 1974.

On August 1, 1974, IDBC responded to BAQC's comments of June 4, 1974, relative to the Air Quality Supplement to the EIS and a copy of the response was sent to the Regional Administrator of FHWA as well as to EPA (PX 225).

On August 9, 1974, the Regional Administrator of the FHWA approved the supplemental EIS relating to air quality and expressly declared that the Segment is consistent with the SIP. The reasons for the consistency determination by the Regional Administrator of FHWA are contained in a six-page statement (PX 228) attached to the letter transmitting his approval of the supplemental EIS to the Office of Environmental Policy of FHWA pursuant to ¶ 6j of PPM 90–1.

■ The major procedural defect which plaintiffs allege is fatal to the approval of the final EIS, as supplemented, relates to the timing of its approval. They argue that the final EIS was approved by the Acting Secretary of USDoT on April 8, 1974, admittedly prior to the circulation of the air quality supplement to the EIS on April 22, 1974, a fact which, it is alleged, made the ". . . circulations of the final EIS (in full) for I–95, Caton to Russell, . . . inadequate, and therefore an inadequate basis for subsequent decision making." [30] This argument of the plaintiffs is premised upon PPM 90–1 and upon 23 C.F.R. § 770.204(b)(3)(iii), referred to above, which requires that comments on an air quality supplement to an EIS, received from local, state, and federal agencies with expertise in air quality, are to be processed following the procedures outlined in PPM 90–1.

In considering this argument of plaintiffs, note must be taken of the fact that the regulations and statutes involved did not require the Secretary of USDoT to approve or concur in the EIS as such (PPM 90–1, ¶ 6j; USDoT Order 5610.1A

---

30. *See* p. 1, plaintiffs' memorandum of law, 11/26/74.

¶ 8*l*, 8m, and 8n), but merely required approval of the Regional Administrator of the FHWA and the concurrence of the Assistant Secretary for Environment, Safety and Consumer Affairs of USDoT.[31] The final EIS was approved by the Regional Administrator of FHWA on April 13, 1973, and by the Assistant Secretary for Environment, Safety and Consumer Affairs of USDoT on September 19, 1973. Because this project involved the use of parkland, however, a "4(f)" statement was combined with the final EIS, and the combined documents were, in fact, approved by the Acting Secretary of USDoT in the exercise of the responsibility mandated by 16 U.S.C. § 470f, 23 U.S.C. § 138, and 49 U.S.C. § 1653(f) under the procedures authorized by USDoT Order 5610.1A, ¶ 8*l* (b), ¶ 9j, and ¶ 10. Because of the fact that the EIS also served as a "4(f)" statement the combined document was not forwarded to CEQ, as required by the applicable regulations[32] until April 17, 1974, subsequent to the action of approval by the Secretary of USDoT. Thus, although the Acting Secretary of USDoT approved the combination final EIS and "4(f)" statement in April, 1974, after the effective date of the Interim Air Quality Guidelines, the final EIS itself had been approved by both the Regional Administrator of FHWA and by the Assistant Secretary for Environment, Safety and Consumer Affairs by September 19, 1973, prior to the effective date of the Interim Air Quality Guidelines, 23 C.F.R. 770, 38 F.R. 31677 (11/16/63). The final EIS, therefore,

as distinguished from the air quality supplement to the EIS, had received its required approvals, contrary to plaintiffs' argument, before the circulation of the air quality supplement.

The comments of EPA and BAQC were, however, received and considered by the District, Divisional, and Regional officials of FHWA after the air quality supplement to the EIS was officially circulated to EPA and BAQC on April 22, 1974, even though the comments of both EPA and BAQC were received after the 30-day expressed deadline for comments had expired. The comments were considered at the meeting of June 10, 1974, and at the meeting of June 18, 1974, and were addressed in written responses at least on June 11 and August 1, prior to the final consistency determination of the subject segment of I–95 by the FHWA Regional Administrator on August 9, 1974.[33] These written responses by the District Office of FHWA, by IDBC, and by SHA were included in the supplemental EIS as required by PPM 90–1, ¶ 6i and Appendix E, ¶ 2h. In short, the comments were processed in accordance with PPM 90–1 as required by 23 C.F.R. § 770.204(b)(3)(iii) of the Interim Air Quality Guidelines.

Plaintiffs next contend that the EIS was procedurally incompetent in its consideration of alternatives to the proposed construction of I–95 and in its consideration of environmental impacts broader than those on the immediate vicinity of the Segment itself. In a prior decision, MAD v. Volpe, *supra*, 361 F. Supp. at 1385, this court said that "in

---

31. Effective on November 29, 1974, procedures for review and approval of an EIS relating to a highway section have been substantially amended. The new procedures, however, replacing those set forth in PPM 90–1, " . . . do not apply to or in any way affect or alter decisions, approvals, or authorizations - which were given by the FHWA pursuant to directives then in effect . . . ." 23 C.F.R. § 771.4(b), 39 F.R. 41806 (December 2, 1974). Similarly, substantial revisions have been made in procedures by USDoT for the review and approv-

al of an EIS relating to a highway section. These new procedures, however, replacing those contained in DoT Order 5610.1A, do not apply to a final EIS submitted to the Office of the Secretary of USDoT for concurrence prior to September 30, 1974. DoT Order 5610.1B, ¶ 15.c., 39 F.R. 35241 (September 30, 1974).

32. USDoT Order 5610.1A, 36 F.R. 23679 (10/4/71), ¶ 8m.

33. Plaintiffs' Exhibit 228.

**546**

making some of the decisions which amount to major federal action with respect to one or more of the roads or segments thereof in the 3–A System, the Secretary, USDoT, or his delegate, may have to consider with respect to some of the environmental impact problems, not only the environmental impact of the road or segment for which his immediate approval is requested, but also the total environmental impact which would result from the use of the road or segment under consideration if and when used in connection with other segments or roads, already built or proposed to be built."

■ As supplemented by the material furnished in connection with the review by USDoT's General Counsel as well as by the air quality supplement, the final EIS contained at least enough discussion of the environmental effects of the proposed segment of I–95 as to air quality, noise, and other environmental considerations, of the microscale and mesoscale alternatives which were considered, of the irreversible and irretrievable commitment of resources involved in the proposed action, of the economic, soliological, environmental, and other impacts of the proposed action, of the measures proposed to be taken to minimize harm and of the other subjects required to be dealt with in an EIS in order to be procedurally correct.[34] In Part III of this opinion a more detailed description will be given of the contents of the final EIS, as supplemented.

■ From a strictly procedural point of view, plaintiffs have made no point of the fact that design approval for the subject segment of I–95 was granted by the Division Engineer of FHWA on May 21, 1974, prior to the expiration of the 30-day comment and review period of the air quality supplement to the final EIS.[35] Furthermore, the plaintiffs have not asserted as an issue in this case the effect of the fact that the consistency

determination of the Segment with the SIP was not made by the Regional Administrator of FHWA until August 9, 1974, which was subsequent to the date when PS&E authorization was granted for three sections of the segment of I–95 on May 24, 1974, and for the fourth section on July 3, 1974. Those issues not having been raised before the court, no ruling is made on the question of whether or not the issuance of such authorizations and approvals was procedurally defective. Even if these design and PS&E approvals were procedurally defective, however, because of their timing, subsequent approvals of various matters relating to the construction of the Segment by the Regional Administrator of FHWA makes moot any technical deficiency in the absence of bad faith by the appropriate federal governmental officials. Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275 (9th Cir. 1973); Citizens for Mass Transit Against Freeways v. Brinegar, 357 F. Supp. 1269 (D.Ariz.1973). As stated in Part III of this opinion, the court believes the appropriate federal governmental officials acted in good faith.

## II

The next general area of inquiry relating to the approval of the final EIS, as supplemented, is the question of whether the governmental officials involved acted within the scope of their authority in approving the final EIS, as supplemented.

■ The action of the Regional Administrator of FHWA in approving the final EIS on April 13, 1973, and the concurrence of the Assistant Secretary for Environment, Safety and Consumer Affairs of USDoT on September 19, 1973, and the Acting Secretary of USDoT on April 8, 1974, with the Regional Administrator's prior approval of the final EIS, as well as the action of the Regional Administrator of FHWA in approving

---

34. 42 U.S.C. § 4332(2)(C); PPM 90–1, Appendix E; CEQ Guidelines, 40 C.F.R. § 1500.8; USDoT Order 5610.1A, ¶ 8e.

35. Defendants' Exhibit 198.

the air quality supplement to the final EIS on August 9, 1974, are entitled to a presumption of regularity. Citizens to Preserve Overton Park v. Volpe, *supra,* 401 U.S. at 415, 91 S.Ct. 814. No argument has been made by the plaintiffs that those officials did not act within the range of choices potentially available to them under the appropriate statutes and regulations granting them their authority and responsibility to act, nor have the plaintiffs argued that they did not properly construe the limits of their authority. The plaintiffs do, however, strenuously argue that the evidence before the appropriate officials was insufficient to provide a basis for a reasonable belief that the factual preconditions existed which were required to exist in order to justify them in exercising the authority given them to act with approval. As to the former two points, the presumption of validity of the actions of the governmental officials is sufficient, in the absence of any challenge by the plaintiffs, to justify this court in not examining them further. As to the latter point, the facts underpinning the contention are substantially the same as those to be discussed in connection with the third area of judicial inquiry.

## III

The third and last area of judicial inquiry is that generally encompassed by 5 U.S.C. § 706(2)(a). Again paraphrasing Mr. Justice Marshall in Citizens to Preserve Overton Park v. Volpe, *supra,* at 415–416, 91 S.Ct. 814, this area of inquiry requires a determination by the court as to whether or not the challenged decisions were based upon a good faith consideration of the relevant factors as well as upon whether or not there was a clear error of judgment in arriving at the challenged decisions.

The plaintiffs allege three basic deficiencies in the EIS for the Segment. They say first that the traffic projections which were utilized in the final conclusions of the BREIS are so incompetent as to demonstrate a clear error of judgment since they were included as a part of the final EIS upon which the Secretary of USDoT made his final judgment on April 8, 1974. Secondly, the plaintiffs allege that, as a result of the errors in BREIS, all of the relevant factors were not properly and correctly considered in assessing the total environmental impact which would result from the use of the segment of I–95 under consideration if and when it were used in connection with other segments or roads already built or proposed to be built in the Baltimore Metropolitan Area. Lastly the plaintiffs allege that inadequate consideration was given to alternatives to construction of the segment such as the use of exclusive bus lanes, rapid rail transit, reversible directional traffic lanes, and other such restrictive measures and that, therefore, all the relevant factors were not considered and there was a clear error of judgment in approving the final EIS.

At the outset, the court finds as a fact that the federal decision makers at the District, Division, Regional, and National level in the FHWA, as well as in the TES section, the General Counsel's office, and the Acting Secretary's office of USDoT, acted in good faith in making the decisions which are in issue in this proceeding. While it is true that certain of the FHWA officials, particularly at the District and Division level, cannot be said to be subjectively impartial in their attitude to the 3–A System and the subject segment of I–95, the same is true of certain of the Regional officials of EPA and of BAQC. Subjective impartiality is not required, however, but only an open mind, willing and able to exercise good faith objectivity in weighing the reasons, pro and con, for taking a particular action in compliance with the responsibility imposed upon that official by law. Environmental Defense Fund v. Corps of Engineers, U. S. Army, 470 F.2d 289, 296 (8th Cir. 1972), cert. denied 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973); MAD v. Volpe, *supra,* 361 F.Supp. at 1389.

The BREIS study, a summary of which was included in the combined final EIS and "4(f)" statement, formed a major part of the factual background upon which the ultimate decisions which are challenged here were made by the highest authorities in USDoT and FHWA. Essential to the validity of the conclusions of BREIS is the technical reliability of the projections of traffic volumes which were developed in the various alternative transportation systems analyzed. In the area of need for the subject segment of I–95, as well as in the prediction of levels of CO, HC, POX, and $NO_2$, the predictions of traffic volumes in various target years of the several alternative transportation systems studied are crucial. Errors in traffic volume projections most likely would result in errors in conclusions based on traffic volume projections.

Prediction of the future, however, is necessarily a risky business. This court is persuaded that no single methodology or technique in prediction of future traffic volumes has been empirically demonstrated to be an infallible one under all circumstances.

The basic methodology utilized in the BREIS study was to assume a land use pattern and density for each of the respective alternative transportation systems to be examined. Necessarily, such a procedure involves a substantial amount of judgment to be exercised by those who performed the study. The land use predictions were performed by experienced professional land planners and traffic analysts on the staffs of RPC and AMV and were based upon examinations of factors considered most likely to influence land use patterns. While one may disagree with the results within a specific instance of the application of their professional judgment, it is impossible to say with certainty, or even with probability, that their judgment in general was erroneous.

Having decided upon the respective land use which was correlative with a particular transportation system alternative, the travel patterns of all people assumed to be living and working in the region with respect to each assumed land use were then determined by using the trip generation equations developed through the application of computer techniques for the Baltimore region. The basic theory of these equations, euphemistically collectively called a "gravity model," is bottomed upon the proposition that history repeats itself. In other words, it was assumed that there is a demonstrable relationship between, on the one hand, the social economic, and land use characteristics of a parcel of land and its availability or accessibility by various transportation modes, and, on the other hand, the number and mode of trips of persons to and from that parcel of land. The gravity models used in the BREIS were very sophisticated in their predictions of the distribution of the predicted trips on various highway links of the regional highway system and on other parts of the assumed transportation system.

The basic gravity modeling technique employed in the BREIS study, however, is more sophisticated than that which has been utilized in the past in that an attempt was made to break down, for comparison purposes, the land use assumptions into different land use and demographic assumptions for each of the alternative transportation systems being analyzed.

The trip generation equations used in BREIS were based on the travel desires and choices indicated by the BMATS origin and destination study carried out by Wilbur Smith and Company in the Baltimore Region in 1962. The BMATS study did not, however, reflect changes, if any, in travel patterns and choices which might have been caused by the completion and operation of the Baltimore Beltway in 1963 and years following.

There is doubt among professionals in the field whether a massive origin and destination study of the scope of the 1962 BMATS study should be repeated

at the present time to determine whether or not there is any major change in the trip generation relationships which have been caused by the completion and operation of the Baltimore Beltway and other major projects. While it would appear to this court that it is desirable to have as much information as reasonably possible in determining the continuing validity of assumed equations for the projection of future traffic volumes, the court does not believe it appropriate or necessary for it to attempt to set itself up as a super professional transportation analyst or planner to state that the equations are necessarily in error solely because they were based upon the BMATS study of 1962.

The plaintiffs charge most vigorously that the traffic projections of BREIS are understated in all alternatives which include as a component the 3–A System, because the equations do not explicitly contain a factor for "generated" traffic. "Generated" traffic is a term utilized by professional planners and transportation analysts to refer to a phenomenon of combined additional trips on an old road and a generally parallel new road which are greater than those additional trips which can be accounted for simply (1) by diversion of existing traffic from other routes in the general vicinity and (2) from normal growth of traffic in general over a given period of time. There is a dispute among professionals in the fields of transportation planning and analysis as to whether or not the phenomenon of "generated" traffic can be said to exist on a regional basis as opposed to a specific highway link or series of links basis. Furthermore, while transportation planners and analysts talk about "generated" traffic, the phenomenon is not clearly understood, and they do not know the destinations of such traffic or the purposes of the trips which are involved in such traffic. At least some of the generally assumed causes of "generated" traffic were taken into consideration implicitly in the BREIS methodology in that a factor was included (1) for trips diverted from other forms of transportation, (2) for trips which would have been made to other destinations or from other origins if the new route had been less attractive, (3) for traffic changes caused through sophisticated and sensitive changes in land use, and (4) for traffic changes caused by changes in demographic patterns assumed for the various transportation system alternatives.

There is no evidence of any generally accepted methodology among transportation planners and analysts for the inclusion of a factor which explicitly represents other causes of "generated" traffic in a mathematical travel simulation model used for travel forecasting on a region-wide basis for a region comparable in size to Baltimore. Whether "generated" traffic should or can be explicitly taken into account in travel forecasting of a regional type such as is sought in BREIS is a matter of reasonable debate among transportation planners and analysts. To the extent that "generated" traffic is generally accepted to be appropriate to consider in gravity model formulae in reference to a single facility, such traffic was taken into consideration in the travel forecasts employed in BREIS, within the state of the art of travel forecasting, by the data and methodology applied in BREIS on a system-wide basis.

As a part of the 3–C Process, a validation check was made of the simulation formulae utilized for traffic projections and forecasts in the Baltimore region which were used in the BREIS study. The verification process for the models and submodels used in the BREIS for traffic projections compared theoretical simulated projections of VMT for 1970 with extrapolated VMT based upon actual counts for the same year.

It was known that the models would not give an absolutely perfect representation of observed 1970 travel. Rather, it was expected and hoped that they would give the approximate or rough orders of magnitude of the level of the ob-

served 1970 travel. It was also sought to be determined whether the models appeared to show any consistent bias and whether roughly correct levels of travel were shown to have taken place in the correct transportation corridors.

For purposes of the evaluation, traffic counts were obtained from the State Highway Administration and from local jurisdictions. There were actual traffic counts for the simulated crossing of a regional line of division known as the Gwynns Falls screen line. At the Gwynns Falls screen line, the aggregate simulation is 5.6% higher than the aggregate adjusted observed traffic count for 24 hours. The simulation is 40.4% higher for peak periods.

Figure 1 of plaintiffs' Exhibit 239 reflects the ratio of simulated traffic to counted traffic for 24-hour and peak periods at 22 cutlines.[36] The counts used on these cutlines were actual, rather than extrapolated, counts. The cutlines were selected for places which were thought would tell something useful about the way the model was simulating ground conditions, but could only be established at places where actual counts were available for adjacent facilities crossing a corridor cutline. The average of the 22-cutline 24-hour ratio is 95.-04% in the simulation to the actual counts. The average of the peak period ratios for the 22 cutlines is 20.89% higher for the simulation than the actual counts.

A comparison was also made between the adjusted counts of vehicles crossing the external cordons [37] and the simulation. The aggregate simulation was .3% higher than the aggregate adjusted counts of the crossings of the external cordons.

Table 2 of plaintiffs' Exhibit 239 presents comparisons, by volume range of facilities, for the number of count observations actually obtained to the volume simulation for those highway links at the point at which the count was obtained. In volume groups below 30,000 ADT,[38] the simulation is slightly lower than the adjusted counts for 24 hours. For the adjusted range in excess of 30,000 ADT, the counts are 21% higher than the simulation for 24 hours. For the peak period volumes, the simulation is slightly higher for volumes ranging up to 4,000 vehicles, but the counts are 22% higher than the simulation for the 18 observations involved in the comparison for peak volumes of 4,000 or more.

In order to make the comparison of the simulated VMT to the actual VMT, it was necessary to make certain assumptions since traffic counts were available on only approximately 25% of the links in the simulation network. In addition, not all of the actual traffic counts comprising that 25% of the links were made in 1970 and many of those counts were factored to 1970 from counts made as early as 1968 and as late as 1972. In a number of cases, the actual traffic counts were not adjusted for multiple axle vehicles. In computing Table 3 of plaintiffs' Exhibit 239, the actual count, as adjusted for 1970, was used for each link for which an actual count was available and multiplied by the length of that link in order to arrive at vehicle miles traveled. For those links for which an actual count was not available, the average of the counts for links within the strata for which counts were available was used as the count for that link. Each average link count was then multiplied by the length of that link

36. A cutline is an artificial line drawn on the highway network which crosses several roads in the network. The total traffic count for the several roads which the cutline crosses (measured at the points on the several roads where the cutline crosses those roads) is the traffic count for that cutline.

37. An external cordon is the imaginary line which delineates the external limit of the

study area. The external cordons in all the corridors crossed 66 highway facilities ranging in volume from a high of 55,600 on the Baltimore-Washington Parkway to a road with an average daily traffic of 60. A number of the roads have volumes in the low hundreds on a daily basis.

38. Average daily traffic.

in order to arrive at estimated vehicle miles traveled for that link. The total of all such links within a stratum was presented in Table 3 as the actual count.

The VMT comparisons in Table 3 reveal that the model simulates 93.3% of VMT for freeways in high intensity areas. The average for freeways in all areas is 86.8%. The average for principal arterials in all intensity types areas is 84%. The average for collectors is only 45%. The regional average is 79.4%.

Mr. Ockert of the Regional Planning Council and others of the professional planners involved in the BREIS study believed that the relationship in Table 3 tended to show a bias which overstated the actual VMT in relation to the simulated VMT. Their reasoning was based upon the premise that the traffic counts which were available for use in the year 1970 were on highway links on high volume roads on which there was some problem which had precipitated the taking of the traffic count in the first instance and that the use of those traffic counts, as an average to be used in the comparison as the link count for those links for which there was no actual count, would overstate the actual VMT. In other words, the professional people involved in traffic forecasting in this area were of the opinion that the links whose traffic counts were used as the basis for the averaged computation of counts for links for which no actual counts were available were not representative of all links in that stratum.

The participants in the validation check then examined the simulated volume for each of the 4,400 links in the simulation network. The average of the simulation links was determined for those links in a stratum for which counts were available and was compared to the average count of all stratum links determined by simulation. This comparison showed that the average of simulation counts for links for which counts had been taken was higher than the overall average by simulation of all links

in the stratum. It was, therefore, concluded to present the VMT comparison in the travel simulation model validation report (PX 239), on an alternative basis, in an additional table to compensate for the presumed bias.

The VMT for links for which actual counts were available was computed by the use of the actual counts in the same manner as the VMT for those links was computed for inclusion in a stratum in Table 3. For those links for which there were no counts, however, the mean of the counts on links within the stratum for which counts were available was adjusted by a factor, the numerator of which was the average simulated count for all links within the stratum and the denominator of which was the average of all counts within the stratum for which counts had been obtained. On this adjusted basis, as is shown in Table 4 of the validation report (PX 239), the model simulated 107.7% of VMT for freeways and high intensity areas and 95.6% for freeways overall. The regional average for all road and area types was 85.8%.

The difficulties in the validation check caused by the fact that actual counts, factored in a uniform method to the year 1970 and taken by uniform procedure, were not available for all highway links in the various strata has caused the RPC and the state highway officials to embark upon a program designed to eliminate this difficulty in the future. Beginning in the summer of 1974, traffic counts are being taken for planning purposes at random locations of links for different strata. The purpose is to be able to estimate VMT by using counts that are completely free of bias so that the defendants will not have to go through the procedure which was found necessary in the adjustment of counts for the 1970 alternative comparison. The counting program will be uniform in the methodology of taking the counts as well as in the factoring of those counts to arrive at 24-hour and peak period values.

It is true that the adjustment of "actual" VMT reflected in the difference between Table 3 and Table 4 of plaintiffs' Exhibit 239 is not itself proof that the gravity model and submodels utilized in the Baltimore region are functioning correctly. The larger differences between the simulated results and the "actual" counts in Table 3 were assumed by the RPC and other groups responsible for parts of the BREIS to be caused by a "bias" in the use of higher than actual counts, but, of course, it is conceivable that the differences could have been caused by a failure of the models to project VMT to as high levels as were actually occurring. This, in fact, is the thesis of Mr. Morris, the expert for the plaintiffs, who stated his belief that the failure of the BREIS models to include a factor for "generated" traffic, rather than a bias in favor of overstated actual counts, is what resulted in the differences between simulated results and the "actual" counts in both Table 3 and Table 4. While he may well be correct, there is considerable credible expert opinion to the contrary. As the techniques of traffic forecasting are refined in the future, just as they have been in the past, and as the 3–C Process initiates more in-depth analyses and examinations of the BREIS models and submodels, and as more current origin and destination studies are undertaken as a part of the overall continuing planning process in this area, the BREIS models may be found to require extensive revision and recalibration. At the time that this study was initiated and completed, however, and at the time the decisions based thereon were made concerning the Segment, the BREIS model and submodels, and the methodology which was utilized in preparing the traffic projections in issue here fairly represented and were within the state of the art.

■■■■■ An agency processing an EIS and making judgments required to be made by NEPA and related statutory mandates is not required to accumulate " . . . the sum total of scientific knowledge of the environmental elements affected by a proposal." EDF, Inc. v. Corps of Engineers of U. S. Army, 348 F.Supp. 916, 926 (N.D.Miss.1972), aff'd, 492 F.2d 1123 (5th Cir. 1974). Not all experts in the field need agree with the conclusions contained within the EIS nor does the law require that a court find the EIS is scientific perfection. Life of the Land v. Brinegar, 485 F.2d 460, 472–473 (9th Cir. 1973); Redding v. Morton (D.Mont.1974) (6 E.R.C. 1887).

In addition to the alleged error of BREIS as a result of the fact its equations were based upon a 1962 origin-destination study and of the alleged failure to consider "generated" traffic, plaintiffs assert other reasons why the BREIS is substantively invalid and, therefore, does not form a proper basis for the responsible officials to have considered ". . . not only the environmental impact of the road or segment for which . . . immediate approval [was] requested, but also the total environmental impact which would result from the use of the road or segment under consideration if and when used in connection with other segments or roads, already built or proposed to be built." MAD v. Volpe, *supra*, 361 F.Supp. at 1385.

BREIS Tech. Memo. No. 2, entitled "Travel Simulation and Traffic Analysis" stated certain assumptions which were made in the study. Among those assumptions were the following six which the plaintiffs have challenged:

1. "Total travel demand is invariant with system supply. The total number of person trips is a function of social and economic characteristics which vary by alternative only and does not vary either with the amount of highway or transit system available or with the cost of travel."

2. "The relative costs of using transit as compared to highway travel will be approximately stable."

3. "No restrictions such as gasoline rationing or limitation of parking supply will be imposed."

4. "Travel response to such factors as travel time and travel costs will remain constant over the 25-year forecasting period."

5. "By 1980, 28 miles of the Phase 1 Rapid Transit System with a coordinated bus system will be in operation."

6. "By 1995, the full six-corridor Rapid Transit System with a coordinated bus system will be in operation."

A variable for system supply was not expressly placed in the person-trip generation equation used in the BREIS travel forecasts. Professional opinion is uncertain as to the direct relationship, if any, of the availability of highway facilities on a regional basis to the total number of regional person-trips generated.

In BREIS the total number of trips made by people was directly related to social and economic characteristics, such as population, employment, labor force, automobile ownership, and income levels. These socio-economic characteristics vary with the supply and characteristics of the transportation system. The system supply therefore, implicitly, rather than explicitly, influenced the number of person trips generated under the methodologies and equations employed in BREIS. BREIS did reflect differences in predicted VMT with respect to the alternative land use and transportation assumptions. The conclusions were as follows:

| Alternative | VMT (Per 24 hours in millions) |
|---|---|
| 1970 Existing | 17.842 |
| 1980 Complete 3A | 25.977 |
| 1980 3A less Fort McHenry Crossing | 26.000 |
| 1980 No 3A | 25.642 |
| 1995 Complete 3A and GDP | 34.146 |
| 1995 No 3A, all other GDP | 32.826 |
| 1995 Complete 3A, no GDP | 32.217 |
| 1995 No 3A, no other GDP | 28.599 |

The assumption and methodology used by BREIS in this respect was within the state of the art.

As to the assumptions that there would be no gasoline rationing or limitation of parking supply and that the relative costs of using transit as compared to highway travel would be approximately stable, such assumptions in BREIS were based upon the uncertainties existing in those areas at the time that the BREIS was being prepared. Since historical fact could not be relied upon to supply the bench marks, assumptions were necessary.

At the time that the BREIS study was being prepared in 1973, the effects of the so-called energy crisis were not generally known or recognized. It was not until late 1973 that the price of gasoline rapidly escalated and it became apparent that petroleum products, particularly gasoline, would remain at a higher relative cost than other items in our inflationary economy. Since the fall of 1973, transit costs to the riders thereof have decreased in relation to the costs of operating an automobile. New studies have been undertaken, however, as part of the 3–C Process in the Baltimore region to evaluate the effect of the energy crisis on the transportation plan. These studies, now substantially complete, will be a part of the information available when additional segment authorizations are requested.

The assumptions of the BREIS that there would be no transportation restric-

tions, such as gasoline rationing or limitation of parking supply, were made in the early spring of 1973. At that time there were alternative strategies under consideration for adoption as an SIP, but the responsible local, state, and federal government officials had not agreed as to what the plan would be. It was generally known or anticipated that there would be some restrictions on the unlimited use of automobiles, but it was not known exactly which specific plans would be adopted. It was not until December 12, 1973, that the EPA, after having rejected the SIP submitted by the Governor of Maryland, promulgated in the Federal Register its SIP for Metropolitan Baltimore which included deliberate restrictions on automobile use. That plan became law on January 12, 1974. Two basic reasons existed for the assumption in the BREIS of no automobile restrictions. The first reason was that it would have been extremely difficult and inefficient to analyze a variety of restrictive plans at a time when it was not known which plan or combinations thereof would be approved as law. Secondly, the assumption of no restrictions on the use of the automobile would enable the policy makers to see what air quality and other conditions would prevail without transportation controls in order that they could move from the least restrictive measures to the more restrictive measures in the event that air quality and other conditions required increased restrictive measures on the use of automobiles. On December 27, 1973, a contract was made with AMV to perform an analysis of the effect of the SIP strategies as a supplement to the BREIS under the continuing 3–C Process.

■■■■■ NEPA, § 102(2)(C), does not ". . . require that every conceivable study be performed and that each problem be documented from every angle to explore its every potential for good or ill." Sierra Club v. Froehlke, 345 F.Supp. 440, 444 (W.D.Wis.1972), *aff'd,* 486 F.2d 946 (7th Cir. 1973).

The agency must undertake in good faith a diligent research effort ". . . which utilizes effective methods and reflects the current state of the art of relevant scientific discipline." E.D.F. Inc. v. Hardin, 325 F.Supp. 1401, 1403 (D.D.C.1971). In the absence of empirical data or hard facts at the time that the BREIS study was being prepared, the study was not technically inadequate solely because it stated assumptions of this nature which later proved to be incorrect, particularly where steps have been taken through the 3–C Process to analyze BREIS results further in the light of later developments for use in making subsequent decisions. *Compare* State of Texas v. Environmental Protection Agency, 499 F.2d 289, 301 (5th Cir. 1974). It would be the height of folly to require that no technical studies could be made in the area of traffic forecasting until the sweep of external events influencing the traffic projections had stabilized. History and common sense tell us that such a statutory or judicial mandate would prevent studies from ever taking place. All that is required is that assumptions, where necessary or desirable to be made as the groundwork for a study of this type, be made in good faith and with a rational explanation. Such exists here.

The assumptions of BREIS that travel response to such factors as travel time and travel costs will remain constant over the 25-year forecasting period is not seriously challenged in its validity by the plaintiffs. Under the foregoing criteria, it was an appropriate assumption.

Similarly, the assumptions of BREIS relating to the extent of rapid rail transit in operation in the Baltimore region in 1980 and 1995 were appropriate. Completion of Phase One of the rapid rail transit system by 1980 was assumed in BREIS because previous transit planning had indicated that as a reasonable target year. MTA is currently estimating 1981 as the completion date for Phase One, the ceremonial groundbreak-

ing for which has been held. The difference between the years 1980 and 1981 is relatively unimportant in travel projections since the projection techniques are not that precise. From the standpoint of air quality, Phase One has very little effect on air pollution in the short term. The full six-legged rapid rail transit system is assumed for the 1995 target year because it is the official policy of the region as embodied in the GDP. Using the criteria above set forth, these assumptions were appropriate.

For reasons which are more fully discussed in reference to the finding of consistency between the plan for construction of the Segment and the approved SIP, the consideration of air quality in the BREIS also passes muster in that the relevant factors were considered in good faith and there was no clear error of judgment.

Turning now to the discussion of alternatives to construction of the segment of I–95, no point is made by the plaintiffs that there was not adequate consideration of alternative alignments. On the contrary, the plaintiffs argue that there was not adequate consideration of alternatives to building the Segment at all in any location.

On p. 7 of the original text of the final EIS, after a brief statement of the history of the study of proposed expressway systems in the Baltimore region over a 25-year period, it is stated in reference to the Segment as follows:

"The alternative of no highway at all would leave the area of southwest Baltimore with inadequate transportation facilities. Industrial and commercial growth would be stymied by lack of adequate access. Existing residential areas would suffer from large volumes of truck traffic on their streets.

"The Baltimore-Washington Expressway corridor would ultimately become unbearably overloaded since it would be the only adequate access

point to Baltimore City for all south and southwest traffic."

On p. 14 of the "4(f)" section of the final EIS the following statement is made.

"Economically speaking, the roadway would stir and retain commercial interests within the city limits. Industry which depends largely on trucks as their main means of shipping and delivering will remain in the city rather than move to the Maryland counties due to their easy access to I–95. Also, the highway along with the proposed rapid transit system will provide people with quicker means of travel to downtown shopping areas and the new inner harbor redevelopment project.

"As a transportation facility, I–95 provides an integral link between the northern and southern states. . . . With respect to Baltimore City, traffic can use I–95 as a bypass of the city or can interchange with I–395 and drive directly into downtown Baltimore."

In responding to the comments of the EPA in its letter of January 19, 1972, filed as an attachment to the final EIS, IDBC, in a letter dated February 8, 1972, also filed as an attachment to the final EIS, stated in reference to alternatives proposed to construction of the Segment, as follows:

"Converting lanes of Russell Street or the Baltimore-Washington Parkway during peak hours is an impossibility. These facilities do not operate at a directional split which would allow such an alternative. A 65–35 or even 60–40 split may allow this. However, portions of Russell Street are almost a 50–50 split at peaks both morning and evening. The Baltimore-Washington Parkway because of its interstate character has a tendency to oddball peak hours in directions opposite from what may be anticipated. For instance on Friday afternoons traffic from the Beltway *inbound* is often heavier than outbound. In most in-

stances these facilities operate near peak capacities during rush hours." (Emphasis in original).

IDBC's letter also noted that staggering of work hours to reduce peak volumes was being done "to a large extent already to spread peak hour traffic in many areas of the city." As to the suggested EPA alternative to the construction of the Segment of establishing exclusive bus lanes on existing roadway facilities to encourage utilization of mass transit service in the corridor to be served by I–95, IDBC's letter stated:

"This is hard to do when extensive portions of the Baltimore-Washington Parkway are only two lanes each way now. Russell Street, although three lanes each way, allows no space for exclusive bus lanes without usurping an existing travel lane. This would result in monumental traffic jams."

In response to an EPA suggestion that an alternative to the construction of the Segment would be an improvement and expansion of public transportation modes such as bus and rail service, IDBC responded that the improvement of public transportation facilities "is considered an integral part of the transportation network, not as an alternative. The highway program assumes existence of a future rail rapid transit line in this corridor as well as additional bus services."

■ As previously noted, the final EIS, as supplemented, included a summary of the BREIS study, the express purpose of which, among other things, was to study and analyze the transportation system alternatives in the years 1980 and 1995 and the environmental effects which those alternatives could reasonably be expected to have. Attached as Appendix 1 to this opinion is a chart contained in the final EIS, as supplemented, entitled "Evaluation of Short-Term (1980) Effects." Attached as Appendix 2 is an additional chart found in the final EIS, as supplemented, entitled "Evaluation of Long Term (1995) Effects." In summary form these two charts set forth the results of the BREIS study. While the conclusions of BREIS, for reasons discussed elsewhere in this opinion, may in part be debatable, they represent the results of a diligent research effort which, in good faith, utilized ". . . effective methods and reflect[ed] the current state of the art of relevant scientific discipline," and ". . . should be judged in light of the scope of the proposed program and the extent to which existing knowledge raises the possibility of potential adverse environmental effects." E.D.F., Inc. v. Hardin, *supra*, 325 F.Supp. at 1403. In the light of all of the transportation studies which have been undertaken over the past 25 years in the Baltimore region,[39] it was not necessary for the EIS to restate the conclusions of all of the experts, or to engage in, for the purposes of this one project, a restatement of all of the factors relating to city-wide and regional transportation plans as they affect the subject segment of I–95. Alternatives to the 3–A System, of which the subject segment of I–95 is a part, were adequately examined in their respective foreseeable environmental impacts, and the evidence discloses that a good faith "hard look" at the salient problems was made by the responsible officials for the purpose of engaging in reasoned decision making. Whether or not this court agrees with their ultimate conclusion is immaterial. It is not the function of this court to set policy nor to substitute its judgment for that of those federal officials whose responsibility to act is imposed by statute or regulation. Having engaged in a "substantial inquiry," the court concludes that the approval of the EIS, as supplemented, for the Segment was not arbitrary and capricious and did not constitute a *clear* error of judgment.

39. See MAD v. Volpe, *supra*, 361 F.Supp. 1369–1379.

*Validity of Consistency Finding*

## IV

 As previously noted in Part I of this opinion, in response to the mandate of the Federal-Aid Highway Act of 1970,[40] Interim Air Quality Guidelines were adopted by FHWA on November 16, 1973. For the reasons set forth in Part I in this opinion, it is this court's judgment that there was no procedural error in the approval by the Regional Administrator of the FHWA of the Air Quality Supplement to the final EIS. His approval constituted evidence of his positive finding on the consistency of the highway proposal with the SIP. 23 C.F.R. § 770.204(b)(3)(iii). Furthermore, the evidence here is clear that the Regional Administrator of FHWA did not make a positive determination of consistency without first consulting with representatives of the EPA Regional Administrator in compliance with the provisions of 23 C.F.R. § 770.-204(b)(1)(v)(A).[41] As a result of the all-day meeting of June 18, 1974, which was attended by Region and Division officers of FHWA and Region and Washington headquarters officials of EPA, a memorandum of understanding between FHWA, EPA, IDBC, BAQC, and Maryland DoT was executed, dated June 28, 1974. While it was in error in saying that FHWA, as opposed to the Division Engineer of FHWA, had found the subject segment of I-95 to be consistent with the SIP, the memorandum of understanding went on to state that its purpose was to attempt to resolve the concern of EPA and BAQC over the consistency of the construction of the subject segment of I-95 with the SIP and was entered into ". . . in recognition of the continuing Clean Air Act requirement to attain and maintain air quality levels within the limits of the national ambient air quality standards . . . ."[42]

---

40. 23 U.S.C. § 109(j) provides as follows:
"The Secretary, after consultation with the Administrator of the Environmental Protection Agency, shall develop and promulgate guidelines to assure that highways constructed pursuant to this title are consistent with any approved plan for the implementation of any ambient air quality standard for any air quality control region designated pursuant to the Clean Air Act, as amended."

41. This provision of the Interim Air Quality Guidelines in terms applies only to those cases in which, unlike the present circumstance, the EIS has not been approved by the Regional Administrator of the FHWA prior to October 15, 1973. Even if it did apply, however, the requirement has been met.

42. The memorandum of understanding said in pertinent part:
"2. The parties will immediately exchange information on their air pollution analyses for the Segment which describe the conclusions, assumptions, and supporting methodology used.
"3. The parties will, as expeditiously as possible, use all reasonable efforts:
"a. following the exchange of the information described in paragraph 2, to resolve the technical differences in the EPA, BAQC, and FHWA studies of the Segment.
"b. In the event such resolution demonstrates that the unrestricted use of the Segment would prevent its meeting Air Quality Objectives, to study and thereafter implement the most feasible Usage Restrictions. Strategies to be investigated would include, but not be limited to, high occupancy vehicle (carpool, bus, vanpool) lanes, to increase the people carrying capacity and efficiency of the Segment.
"4. During the first two (2) years after the Segment has been opened for usage by vehicular traffic;
"a. FHWA will:
"(1) Conduct carbon monoxide monitoring at agreed upon sites, not to exceed three (3) in number and for agreed upon three-month periods representing the three (3) worst months of the year for CO concentrations, as determined by historic data gathered from the WILMARCO Station, using methodology and equipment approved by EPA for monitoring carbon monoxide; and
"(2) Perform annual hydrocarbon emission projections in the Regional Subarea using methodology approved by EPA.
"b. The parties will annually review, and if necessary, by revision of Maryland's SIP, revise the Usage Restrictions and

It was only after the memorandum of understanding was executed that the Regional Administrator, FHWA, made the consistency finding of the subject segment of I–95 with the SIP on August 9, 1974.

While PS&E approvals of four sections of the subject segment of I–95 from Caton Avenue to Russell Street were approved by the Division Engineer of FHWA prior to the finding of consistency by the Regional Administrator, it would serve no useful purpose to exalt form over substance and require construction work to stop while new PS&E approvals are issued. The good faith action of the Regional Administrator of FHWA in making his finding of consistency with the SIP cures whatever error existed in issuing the PS&E approvals prior to the consistency approval by the Regional Administrator. Particularly is this so since the plaintiffs did not raise that particular alleged procedural error as a basis for their cause of action. Compare Jicarilla Apache Tribe of Indians v. Morton, supra, 471 F.2d at 1284; Citizens for Mass Transit Against Freeways v. Brinegar, supra.

### V

Plaintiffs have not alleged or shown that the Regional Administrator, FHWA, acted outside of the scope of his authority in making the finding of consistency with the SIP, and the court, therefore, will not discuss any of the aspects of that question.

### VI

The plaintiffs do allege that the finding of consistency between the

plan for construction of I–95, Caton Avenue to Russell Street, and the SIP was arbitrary and capricious. As previously noted, such an allegation in this type of proceeding requires the court to make a substantial inquiry. The court may not uphold the challenged finding unless it is determined that the decision was based upon a good faith consideration of the relevant factors and that there was no clear error of judgment by the person or agency making the challenged decision. While due deference must be given to the presumption of regularity of the official action, that presumption may not be used as an excuse for failure to make a probing review of that action. Citizens to Preserve Overton Park v. Volpe, supra, 401 U.S. 415–416, 91 S.Ct. 814.

Since the statute, 23 U.S.C. § 109(j), and the Interim Air Quality Guidelines require a determination of consistency of the construction of a highway ". . . with any approved plan for the implementation of any ambient air quality standard for any air quality control region . . . ," a starting point in this analysis is to determine what ambient air standards have been established for the Baltimore region.

Pursuant to the requirement of 42 U.S.C. § 1857c–4, EPA has promulgated national primary [43] and secondary [44] ambient air quality standards. The primary and secondary standards for CO are:

(a) Nine parts per million (9 p.p.m.) as a maximum eight-hour concentration which is not to be exceeded more than once per year, and

---

use their best efforts to make other arrangements to continue the monitoring provided for in subparagraph 4a above, it being understood that FHWA's funding of monitoring under the agreement shall be limited to the aforesaid two-year period.

"5. The Segment will be used at such times and in such manner as to be in compliance with the Air Quality Objectives. In the event the condition referred to in paragraph 3b occurs, the initial usage of the Segment shall, prior to such use, be provided for in a revision to Maryland's SIP; provided that if there should be a

photochemical oxidant violation for the Baltimore AQCR, the usage of the Segment will, with regard to such violations, be reviewed in the same manner as other traffic in the Baltimore AQCR, and not in isolation.

"6. This agreement shall not be construed as a finding by EPA as to the consistency of the Urban Transportation Plan and Program with Maryland's SIP under 23 CFR Section 770.204(a)."

43. 42 U.S.C. § 1857c–4(b)(1).

44. 42 U.S.C. § 1857c–4(b)(2).

(b) Thirty-five parts per million (35 p.p.m.) as a maximum one hour concentration which is not to be exceeded more than once per year.[45]

The primary and secondary standards for photochemical oxidants is .08 p.p.m. as a maximum one hour concentration not to be exceeded more than once per year.[46] The primary and secondary standards for hydrocarbons are .24 p.p.m. as a maximum three-hour concentration (6 to 9 a. m.) not to be exceeded more than once per year.[47] The primary and secondary standards for nitrogen dioxide are .05 p.p.m. as an annual arithmetic mean.[48]

The BREIS study showed that existing ambient air quality in the Baltimore area [49] does not presently meet national ambient air quality standards promulgated by EPA.[50] The purpose of the SIP is to attain, maintain and enforce the national ambient air quality standards in the Baltimore air quality control region.[51]

There is no definition in either 23 U. S.C. § 109(j) or in the Interim Air Quality Guidelines, adopted pursuant thereto, of the term "consistency." The SIP itself does not purport to impose a blanket moratorium on all new highway construction, that concept having been rejected by the Regional Administrator of EPA in the promulgation of the SIP.[52] In addition, the fact that a blanket mor-

atorium was not intended to be imposed is made clear by the indirect source regulations promulgated by the EPA on July 9, 1974.[53] Even though these indirect source regulations do not apply to highway projects on which construction commenced prior to December 31, 1974,[54] as is the case with respect to the subject segment of I–95, the indirect source regulations of EPA, in establishing certain requirements for approval by EPA of highway construction projects commenced after December 31, 1974, necessarily indicate that highway construction *per se* is not interdicted.

According to Webster's Third New International Dictionary (Unabridged, 1966), the word "compatible" is an appropriate synonym for the word "consistent" as it is used in 23 U.S.C. § 109(j). The purpose of 23 U.S.C. § 109(j) and the Interim Air Quality Guidelines adopted pursuant thereto, therefore, is to develop a process for approval of highway construction that will result in the construction of highways which are not incompatible with an SIP which has, in turn, been promulgated to attain, maintain, and enforce the ambient air quality standards for a particular region established under the Clean Air Act of 1970.

■■■■ Consequently, at least part of the methodology contemplated for a determination of consistency under 23 U.

---

45. 40 C.F.R. § 50.8, 36 F.R. 22384 (Nov. 25, 1971).

46. 40 C.F.R. § 50.9, 36 F.R. 22384 (Nov. 25, 1971).

47. 40 C.F.R. § 50.10, 36 F.R. 22384 (Nov. 25, 1971).

48. 40 C.F.R. § 50.11, 36 F.R. 22384 (Nov. 25, 1971).

49. Actually the area covered by the BMATS study of 1962.

50. Appendices 1 and 2 to this opinion.

51. See general discussion in *MAD v. Volpe, supra,* 361 F.Supp. 1398–1399.

52. After noting that testimony had been received preparatory to promulgation of the SIP advocating a moratorium on new highway construction, the EPA Regional Administrator stated in the introductory background discussion of the SIP as follows:

"A blanket moratorium would be an irresponsible act if highway projects that could lead to reduced emissions were included. A special regulation which requires prior review and approval of all projects opens environmental concerns to fragmentation and additional technical complexities that would compound the bureaucratic superstructure, and still not be responsive to long-term growth considerations. Therefore, the Administrator is of the opinion that the intelligent use of current procedures offers the best prospect to control VMT and reduce emissions, especially hydrocarbons, which contribute to the excessive levels of photochemical oxidants in the metropolitan Baltimore intra-state region." 38 F.R. 34245 (Dec. 12, 1973).

53. 39 F.R. 25292, 25298–25299.

54. 40 C.F.R. § 52.22(b)(3).

S.C. § 109(j) is a comparison of the potential effects of the subject highway project with the specific parts of the applicable SIP.[55]

The SIP is a composite of various programs. Basically, those programs can be divided into three categories, as follows: (1) surveillance of ambient air,[56] (2) the regulation of stationary sources,[57] and (3) regulations relating to mobile sources.

The mobile source regulations in the SIP can be divided into two subparts consisting of those which operate directly on the motor vehicles themselves[58] and those which generally could be termed VMT reduction strategies.

The retrofit requirements and the maintenance inspection requirements apply to motor vehicles wherever they are operated and do not relate specifically to highways as such. The construction of the Segment could not, therefore, be inconsistent or incompatible with such requirements.

The VMT reduction strategies of the SIP are six in number.[59] They are strategies for (1) a computer-aided car-pool matching system,[60] (2) reduction in parking provided by employers,[61] (3) requiring exclusive bus and car-pool lanes along certain transportation corridors to the central business area of Baltimore City during peak a. m. and p. m. periods by January 1, 1976, in those corridors in which it is feasible,[62] (4) the prohibition by May 1, 1975, of parking on all streets on which exclusive bus and car-pool lanes have been provided during the peak a. m. and p. m. periods,[63] (5) approval by the EPA of all parking facilities with a capacity of 250 or more vehicles on which construction or modification is begun after January 1, 1975,[64] and (6) for the reduction of total gallonage of gasoline delivered to retail outlets in the Baltimore region if national ambient air quality standards for CO and POX have not, or will not, be met in that region by May 31, 1977.[65]

There is no evidence that the construction of the subject segment of I–95 will be incompatible with, inconsistent with, or will prevent the implementation of any of the six VMT reduction strategies set forth in the Maryland SIP. The construction of the questioned segment of I–95 will not preclude its use for exclusive bus lanes or car-pool lanes. Indeed, the memorandum of understand-

---

55. In the future, under regulations recently promulgated by EPA (39 F.R. 25297 [July 9, 1974]), most proposed major highway projects will be required to obtain approval directly from the Administrator of EPA or his delegate before construction may begin. He may not approve the requested highway construction if he determines it will "(a) cause a violation of the control strategy of any applicable state implementation plan or (b) cause or exacerbate a violation of the national standards for carbon monoxide in any region or portion thereof." 40 C.F.R. § 5.22(b)(6)(i). Direct approval of a highway project by the EPA Administrator or his delegate is not required by the regulations, however, for a highway project on which construction commenced prior to January 1, 1975. 40 C.F.R. § 52.22(b)(3). These regulations were adopted by EPA pursuant to the purported authority of the Clean Air Act.

56. 40 C.F.R. § 52.1077(c)(3).

57. E. g., 40 C.F.R. §§ 52.1101, 52.1107, 52.-1112.

58. See e. g. 40 C.F.R. §§ 52.1096–1100 providing for retrofit of certain devices on used motor vehicles and 40 C.F.R. § 52.1095 providing for inspection of vehicles for emissions.

59. In addition to the six strategies enumerated, the SIP also requires the establishment of at least 15 miles of exclusive bicycle lanes in each direction in and around the central core of Baltimore City. 40 C.F.R. § 52.-1106. Since the length of trips on freeway facilities such as the disputed segment of I–95 would be expected to exceed the general expected length of bicycle trips, a significant effect of this strategy on projected I–95 traffic is not anticipated, PX 79, p. 48.

60. 40 C.F.R. § 52.1104.

61. 40 C.F.R. § 52.1105.

62. 40 C.F.R. § 52.1108.

63. 40 C.F.R. § 52.1109.

64. 40 C.F.R. § 52.1111.

65. 40 C.F.R. § 52.1110.

ing of June 28, 1974, expressly recognizes that usage restrictions may, under the conditions set forth in the agreement, be implemented on the Segment.

There being no overt inconsistency or incompatibility between the SIP strategies and the plan for construction of the Segment, the next question is whether or not, under the Interim Air Quality Guidelines and measured against the background of the purposes of NEPA and the Clean Air Act of 1970 to cause the quality of the ambient air to meet, and be maintained at, certain desirable standards in order to enhance the environment and promote the health of our citizens, the FHWA Regional Administrator acted arbitrarily by clearly overlooking or ignoring a plain and indisputable indirect incompatibility or inconsistency between the two. Since the purpose of the SIP is to accomplish the achievement and maintenance of the national ambient air quality standards in the Baltimore air quality control region, the standard which appears to be implicit in the Interim Air Quality Guidelines for the determination of consistency is logically that the construction of the highway section in issue will not significantly, either alone or in conjunction with other parts of an urban transportation system, contribute to a failure of the region to meet the national ambient air quality standards.

The examination of the air quality impact of a particular highway segment, therefore, has two levels. The first deals with the air quality impact of the highway segment alone. The second is the impact of that highway segment, together with other transportation facilities, which constitute the urban transportation system as set forth in the urban transportation plan.

The nature of carbon monoxide is that it is a localized problem, which must be measured on a highway segment basis.[66] On the other hand, the problem of POX, HC, and $NO_2$, by the nature of those substances, is a regional one since the localized effects of those substances are relatively minor.[67]

In recognition of the difference in the extent of the geographical areas of consideration for the different air pollutants, both the Interim Air Quality Guidelines (38 F.R. 31677 [Nov. 16, 1973]) and the Final Air Quality Guidelines, adopted after the close of evidence in this case (39 F.R. 44441 [Dec. 24, 1974]), provide for "consistency" determinations to be made at two different levels. The highway section consistency determination is made by the FHWA Regional Administrator under 23 C.F.R. § 770.204 for the purpose of considering the air quality impact of the specific highway segment under consideration.[68] The regional air quality impact, on the other hand, which can only realistically be evaluated at a level extending beyond the particular highway segment in question, is made under 23 C.F.R. § 770.204

---

66. The final EIS on "Air Quality Guidelines, Regulatory Action, Implementing § 109(j), Title 23, U.S.C." of the Department of Transportation, filed with CEQ on September 17, 1974, on p. 15, states:

"While many aspects of the air quality problem are regional in nature there are some which impact the highway corridor directly. The carbon monoxide impact is one which is localized in effect and should be evaluated within the highway corridor. It was felt that the environmental impact statement process was a logical instrument for the consideration of such impacts and could be used to assess the consistency of highway sections with the State implementation plan."

67. *Id.*, at p. 26, where it is stated:

"Conversely, the evaluation of unstable pollutants at the project level is meaningless. The effect of hydrocarbons and oxides of nitrogen have been shown to be relatively minor on a local (or project) scale; however, their products from the photochemical process are a serious health hazard but due to the time for the reaction to take place, the impact is far removed from the point where the pollutants were emitted. Due to the time delay factor and the dispersion characteristics a regional consideration of photochemical oxidants is necessary."

68. *Id.*, at pp. 15 and 27.

through a process of review by the FHWA Regional Administrator, in consultation with the EPA Regional Administrator, of the consistency of the urban transportation plan and program with the approved SIP as a part of the FHWA Regional Administrator's responsibility for approving or certifying the 3–C Process.[69]

The highway section "consistency" determination deals with the level of carbon monoxide in the ambient air. This analysis is the so-called "microscale study." In order to arrive at a meaningful conclusion in the microscale study, separate computations must be carried out for (1) background concentrations of CO [70] and (2) the total highway-generated CO concentration at a particular receptor site. In turn, the total highway-generated CO concentration at a particular receptor site is obtained by superimposing by appropriate calculations the concentrations of CO generated from all upwind highway links in the study area.

The CO concentrations from mobile or highway generated sources are a factor of VMT multiplied by emission equations in turn applied to a mathematical model intended to predict the diffusion of gaseous CO based upon atmospheric and other relevant conditions.

Since the national ambient air quality standards for CO may not be exceeded more than once per year, the study must be directed to a "worst case" condition.

The microscale study of the Segment utilized the California "Highway Line Source Air Pollution Model," based upon the Gaussian diffusion equation, and modified to expand the computer program to project pollutant concentrations generated from a number of highway links in the study area at a point at the desired distance from the edge of the challenged segment of I–95. The model requires input data of peak vehicle volume per hour, emission factors at each average vehicular speed, wind speed, and wind angle with respect to highway alignment, height of highway pavement, receptor height, distance from edge of the shoulder to the receptor, atmospheric stability class, molecular weight of CO, and identification of the roadway producing the emissions. The theoretical result of the calculations, after adding the appropriate background concentrations, is the one hour maximum CO concentration at any particular receptor site.

The vehicle population and background CO concentrations in the microscale study area which were utilized in the air quality assessment supplement to the final EIS on the Segment were derived from the BREIS study. The legal validity of reliance on the traffic projections of BREIS has been discussed in Part III of this opinion. The calculations of the maximum background CO concentrations were based upon the "Stanford Research Institute's Urban Diffusion Model" in BREIS and considered all mobile sources in the region to calculate the maximum one-hour background concentration associated with different transportation alternatives under "worst" meteorological conditions. This methodology, the court is satisfied, was within the state of the art at the time the studies were conducted.

One of the critical elements in the microscale study is the determination of the location of the receptor sites to be utilized. A receptor site has been defined by the EPA as "a location where a

69. *Id.*, at p. 14, where it is stated:

"The regional nature of the air quality problem, particularly that associated with photochemical oxidants, as well as the regional nature of the transportation control strategies developed to meet the requirements of the Clean Air Act, made clear the fact that the consideration of air quality must begin at the transportation planning stage. Therefore, the guidelines seek to incorporate air quality considerations into the planning process (the 3–C Process established pursuant to Title 23, U.S.C. § 134). Further, the guidelines seek to assure that land use transportation planning be compatible with air quality planning." *See also* p. 26.

70. *I. e.*, from non-mobile sources.

person or persons might reasonably be exposed for time periods consistent with the national ambient air quality standard for carbon monoxide."[71] Although this definition was promulgated subsequent to the time of the preparation of the microscale study of I–95, it is a rational definition which the court accepts as applicable in this case.[72]

In concrete terms, this court believes that such definition must be interpreted to require the designation of receptor sites at areas where it can reasonably be anticipated that persons will remain for one hour in the case of the one-hour standard and for eight hours in the case of the eight-hour standard. Based upon this interpretation, the receptor sites chosen by AMV for the Segment air quality assessment were reasonable.

The receptor sites utilized by AMV for the microscale study were all in excess of 200 feet from the edge of the highway pavement. Although plaintiffs argued that a worst-case analysis should have included a parallel wind condition, this court is satisfied from the evidence that CO concentrations in general are much less at distances of more than 200 feet from the highway under parallel wind conditions than under cross-wind conditions. Therefore, the northwest wind direction used in the CO study of the Segment was appropriate for a worst-case analysis.

Plaintiffs also contended that the CO microscale analysis of the Segment was invalid because the most stable atmospheric condition was not utilized in the worst-case analysis. Although there may be ground for scientific dispute as to whether or not stability class D (utilized by AMV) or stability class E (proposed by plaintiffs) is the most appropriate to have been used, unanimity among experts is not the *sine qua non* for a legally valid air quality study within the present context. Since there is, the court finds, room for reasonable and rational scientific disagreement on the subject under the present state of the art, there can be no *clear* error of judgment on the part of one who in good faith relies upon the results of a worst-case CO analysis in which atmospheric stability D was one of the assumed factors.

In a Gaussian Plume model the wind speed is a denominator in the equation, and accordingly a wind speed of one meter per second is the worst case which can be simulated. If the wind speed were reduced to zero, the equation would produce infinity. The use of one meter per second as the wind speed in the Segment CO worst-case analysis was, therefore, reasonable.

Region 3, EPA, was of the view that the CO microscale study should have utilized the HIWAY model, another version of the Gaussian Plume equation, rather than the California Line Source model. Both models are within the state of the art. While the HIWAY model generally produced higher predicted concentrations of CO at designated receptor sites than did the California Line Source model, neither model, utilizing the inputs of AMV as to wind speed, atmospheric stability, emission factors, vehicle population, and receptor sites, predicted CO concentrations which were in excess of the one-hour maximum CO standard of 35 p. p. m. as a result of the operation of the Segment in either the near (1980) or long (1995) term under any of the transportation system alternatives studied.

In estimating the maximum eight-hour concentrations of CO, a different

71. "Interim Guidelines For The Review Of The Impact Of Indirect Sources On Ambient Air Quality" (EPA, July, 1974), p. 6 (PX 23–A); *see also,* 40 C.F.R. § 52.22(b) (7).

72. *See also* 40 C.F.R. § 52.22(b)(6)(ii), (39 F.R. 25299 [July 9, 1974]), where it is stated the EPA Administrator is to evaluate "the anticipated concentration of carbon monoxide at *reasonable* receptor or exposure sites which will be affected by the mobile source activity expected on the highway. . . . " (Emphasis added).

approach was employed. Utilizing data accumulated by EPA which indicated that eight-hour concentrations of CO approximate 80% of the maximum one-hour concentration of CO on or near a highway due to the variability in meteorological and traffic conditions over an eight-hour period, AMV multiplied the maximum one-hour concentration by a factor of 0.8 to obtain the maximum eight-hour CO concentration in the worst-case analysis. The challenged segment of I–95, using this method, was predicted to have eight-hour maximum concentrations of CO well below the national standard of 9 p. p. m. at the designated receptor sites.[73]

■ As to the microscale analysis, the court finds, as a matter of fact and of law, that the methodology utlized in the study was within the state of the art and the conclusions reached therein were rational. The Regional Administrator of FHWA, to the extent that he relied on such study in making his determination of consistency on August 9, 1974, considered the relevant factors and cannot be said to have committed a *clear* error of judgment in his determination.

The mesoscale study reached conclusions relating to predicted regional ambient air concentrations in the near (1980) and long (1995) term for various alternative transportation systems of HC, POX, NO₂. CO, and particulates. These conclusions are set forth in Tech. Memo. No. 3 of the BREIS (PX 69).

In predicting regional concentrations of CO, a computer diffusion model, the Standard Research Institute (SRI) Dif-

fusion Model For Carbon Monoxide, was utilized. As in the microscale analysis, the regional CO predictions were made on a worst-case basis. Utilizing what this court finds to have been data and methodology within the state of the art, BREIS concluded that CO one-hour maximum concentrations in the Baltimore region will decline in all transportation alternatives studied. In the worst case, 1980 one-hour concentrations will decrease by one-half and in 1995 by two-thirds below 1970 levels. The eight-hour CO maximum levels are predicted to show a similar relationship. Neither at the present time nor in the 1980 and 1995 projections are the highest CO concentrations at receptor sites in the vicinity of the disputed segment of I–95. According to the Breis conclusions, no violations of the CO national standards for maximum one-hour and eight-hour concentrations will occur under any of the transportation system alternatives studied at any receptor site in the Baltimore region in either the near (1980) or long (1995) term.[74]

In the mesoscale study of HC, POX, NO₂, and particulates, a proportional modeling technique was utilized by the BREIS. While this technique is the least sophisticated modeling procedure, it appears to be the best available technique presently accepted by EPA.[75]

The measurement of hydrocarbons produced by automobile emissions is a means of predicting the level of photochemical oxidants in the ambient air because hydrocarbons, through a chemical process in the presence of a strong sun-

73. Utilizing more current but still limited data, EPA appears to recognize an even more favorable ratio of 0.6 between the one-hour and eight-hour maximum CO concentrations. The FHWA Regional Administrator commented upon this in his determination of the consistency of the segment of I–95 with the SIP on August 9, 1974.

74. A copy of Table VI–16 of Tech. Memo. No. 3 of BREIS is attached as Appendix 3 to this opinion, summarizing the predicted maximum CO concentrations.

75. In the discussion by the EPA Administrator of changes in the indirect source regulations on June 28, 1974, he recognized inherent difficulty in utilizing the rollback method to predict ambient air concentrations of POX and NO₂. He stated that the EPA in the future will eliminate the exclusive use of the proportional model and allow decisions to be based on prediction concentrations of POX and NO₂ obtained by new methods. As of the date of this opinion, the new methods have not been announced by EPA. 39 F.R. 25295 [July 9, 1974].

light in the upper atmosphere, break down to produce photochemical oxidants. The reduction model [75a] for the prediction of photochemical oxidants is derived from the existence of an empirical relationship which has been established between atmospheric oxidant levels and relative hydrocarbon emissions. The prediction of HC levels of concentration in the ambient air rests upon the concept that future year HC air quality levels are proportional to HC emissions by weight during that year as compared to existing HC air quality levels and HC emissions at the present. Therefore, future HC air quality levels are to present HC levels as future emissions are to present emissions. Thus, future HC air quality can be estimated through the relation to each other of present HC air quality, present HC emissions, and estimates of future HC emissions.

The empirical relationship which has been established between atmospheric POX levels and relative HC emissions by weight is not a linear one. The relationship is generally depicted in Figure VI–16 [76] of Tech Memo. No. 3 of BREIS, shown below:

MAXIMUM ONE HOUR OXIDANT CONCENTRATION, PPM

Note: Assumes no Hydrocarbon or Oxidant background

## FIGURE VI-16. REQUIRED HYDROCARBON EMISSION CONTROL AS A FUNCTION OF OXIDANT CONCENTRATION*

75a. See fn. 76, infra.

76. In turn, this graph, a so-called "reduction model," is purportedly an expansion of the graph designated Appendix J., 40 C.F.R., Part 51. For reasons explained, infra, the court believes there was an error in the expansion of Appendix J.

Through the use of the reduction model depicted in Figure VI–16, by measuring the existing ambient air concentration of POX one can determine the percentage by which HC emissions by weight must be reduced to attain the POX ambient air standard of 0.08 p. p. m. See discussion in *State of Texas v. Environmental Protection Agency, supra,* 499 F.2d at 294–295.

Applying the reduction model to the facts here is accomplished by (1) noting that the 1970 observed level of POX was 0.21 p. p. m., (2) referring to the reduction model curve at the point which represents this value on the horizontal axis and (3) reading on the vertical axis the percentage reduction in hydrocarbon emissions required to attain the standard. The conclusion one reaches, a matter on which all parties agree, is that a 70% reduction in HC emissions is necessary to attain the POX standard in the Baltimore region according to the reduction model.

Making the assumptions that (1) the VMT predictions of BREIS were correct, (2) that no transportation control strategies were in force, and (3) that effective implementation had been accomplished of the federal motor vehicle emission controls for new vehicles which were contained in the regulations as of the time of the study, BREIS utilized equations within the state of the art to predict hydrocarbon emissions by weight from motor vehicles in the near (1980) and long (1995) term for all transportation alternatives studied. These hydrocarbon emissions by weight were obtained through a process of multiplication of emission factors for the various type vehicles at the varied study dates, taking into consideration varying traffic conditions as predicted in the gravity model. Since the 6–9 a. m. period is the time when HC emissions are assumed by responsible scientific opinion to contribute to the formation of POX, this time

period is the one for which HC emissions were calculated for the purpose of use in the proportional model to predict POX concentrations.

As a result of the comments of BAQC to the draft of the BREIS Tech. Memo. No. 3, which showed an error in the calculation of the base year of the emissions by weight of HC, the final BREIS predictions for HC and POX levels for the year 1980 and the HC level for the year 1995 were adjusted upwards from those shown in the final EIS which had been based on the earlier BREIS draft. (*See* Appendices 1 and 2 of this opinion). The use of the correct base year emissions of motor vehicles by weight of 50.33 tons for three hours resulted in a change in HC levels in 1980 from .7 p. p. m. to 1.1 p. p. m. in alternatives 3 and 5 and from .8 to 1.1 p. p. m. in alternative 4. This change also caused a change in POX levels in 1980 from .08 p. p. m. to .09 p. p. m. in all three alternatives. In 1995, the reduction in the base year HC emissions resulted in a change in HC levels from .80 p. p. m. in alternatives 6, 7, and 8 to 1.0 p. p. m. and from 0.7 p. p. m. in alternative 9 to 0.9 p. p. m. As a consequence, therefore, the national HC standards in 1980 as well as in 1995 were found in BREIS to be exceeded in all alternatives, including the no-build alternative, and the POX concentrations were found to be exceeded in all alternatives, including the no-build alternative, in 1980, but to have been met by 1995 in all alternatives.[77]

The same proportional modeling technique as is used in determining HC ambient air concentrations is also used to determine the estimated future ambient air concentrations of $NO_2$. Subsequent to the preliminary calculations shown in the draft of BREIS Tech. Memo. No. 3, updated emission projections from BAQC for $NO_2$ resulted in an overall reduction in projected regional emissions of $NO_2$. The revision resulted in a re-

77. See Table II–2, BREIS Tech. Memo. No. 3, attached as Appendix 4 to this opinion.

duction in the projected ambient air concentrations of $NO_2$ from 0.06 p. p. m. to 0.05 p. p. m. for all alternatives in the near and long term. These projections did not include the effects of relaxing the federal emission standards for $NO_2$ on 1976 cars or the control strategies of the SIP. These revised calculations indicate that the national ambient air quality standard for $NO_2$ will be met in both the near and long term for all transportation alternatives studied.

At the time that the studies were being conducted, it was believed that emissions of $SO_2$ from motor vehicles were not a significant factor in the concentrations of $SO_2$ in the ambient air. That conclusion was a reasonable one in light of scientific knowledge at that time.[78]

Through the use of a similar model, the conclusion of BREIS in Tech. Memo. No. 3 was that the particulates standards in the ambient air were met in the near term (1980) and the long term (1995) in all alternatives studied. The plaintiffs have not challenged that finding.

The conclusion of BREIS as to the specific levels of POX in 1980 and 1995 are subject to doubt. The reduction model utilized in BREIS (Figure VI–16) appears to be inaccurate at the endpoint of the curve in that it ends at approximately 0.075 p. p. m. rather than at 0.08 p. p. m., the POX standard. Since the reduction model is designed to show the percentage of reduction in HC emissions *necessary to reach the POX standard of* 0.08 p. p. m., it is inconsistent with the

model's very purpose for the endpoint of the curve to be anywhere other than at 0.08 p. p. m. The court has, furthermore, made a comparison of the horizontal scale of Appendix J with a measurement of the distance from the endpoint of the curve to the nearest value marking on the horizontal axis and has concluded that the reduction curve of Appendix J in fact terminates at the equivalent of 0.08 p. p. m. although the scale on Appendix J is not so marked. No explanation appears in the record for the apparent variance between Figure VI–16 and the premise of the model. Indeed, this apparent variance was not even commented upon by plaintiffs' counsel or witnesses. This shift of the endpoint of the curve, however, on the horizontal axis has the effect of slightly lowering the predicted concentrations of POX if one were to attempt to use the reduction model by calculating from a known percentage reduction in HC on the vertical axis to a predicted POX concentration on the horizontal axis. Both plaintiffs' counsel and the BREIS itself have attempted to use Figure VI–16 in this manner to obtain predicted POX concentration levels. While there is no direct evidence in this record on the point one way or the other, the court has a strong suspicion that the reduction model cannot be utilized in this manner, either through the method of calculation employed in BREIS or through the method of calculation argued for by plaintiffs' counsel.[79]

Even if the reported BREIS conclusions as to the predicted specific levels

---

78. Recently, empirical observations have indicated that catalytic converters required by EPA regulation to be installed on new motor vehicles to reduce emissions of CO, HC, and $NO_2$, have significantly increased emissions of $SO_2$. As a result, on March 5, 1975, the EPA Administrator extended to the 1978 model year the CO, HC, and $NO_2$ new car standards which were previously to be met by 1977. 40 F.R. 11900 (March 14, 1975). These extensions in the deadlines for emission controls of new motor vehicles will have

an as yet unknown effect on the conclusions of BREIS as to the year 1980.

79. At final argument, a conflict developed between counsel on both sides as to the proper method of calculation to be employed to predict specific concentration levels of POX through the use of the reduction model. No evidence bears directly on a resolution of this conflict. While, as noted above, the court has strong doubts that the model can properly be utilized in this manner by either

of POX concentrations are in error, whether because of an inaccurate reproduction of the curve's endpoint on the reduction model or because of an improper use of the reduction model, the error is not determinative under the facts in this case.

The specific levels of POX concentrations predicted in BREIS (*see* Appendix 4 to this opinion) were not essential to the conclusions reached by the Regional Administrator of FHWA in his determinations of August 9, August 13, or November 11, 1974, nor to the consistency determination of RPC relating to the transportation program and plan on June 26, 1974. This is true because those responsible officials did not rely upon the specific levels of either POX or HC which were predicted in BREIS, but instead, based their conclusions on the substantial reductions in HC emissions predicted in BREIS [80] as well as on other factors tending to show consistency.

As previously noted, the regional or mesoscale consistency determination, under the regulatory scheme illustrated by 23 C.F.R. § 770.204, is made through a process of review by the FHWA Regional Administrator of the consistency of the urban transportation plan and program with the approved SIP as a part of the FHWA Regional Administrator's responsibility for proving or certifying the 3–C Process. The EPA

Regional Administrator is to consult with the FHWA Regional Administrator in the latter's review on the record of the policy board's [81] determination annually of the consistency of the then current transportation plan and program with the SIP.[82]

On June 24, 1974, the RPC, the policy board referred to in 23 C.F.R. § 770. 204(a)(2) of the Interim Air Quality Guidelines, adopted a resolution as follows:

"Based on the extensive analysis conducted to date, the transportation plan and programs have been found to be generally consistent with the goals of the air quality implementation plan for the Baltimore region. However, further study of individual elements of the transportation plan may be required to determine project level consistency. Specifically, both plans call for the improvement of mass transit, reduction of future vehicular travel by encouraging carpooling, and traffic flow improvements. Efforts are now under way in the region to implement these programs.

In addition the GDP also recommends encouragement of bicycle transportation and the Department of Transportation has introduced legislation to implement a periodic motor ve-

---

method, the point need not be resolved for reasons stated *infra*.

80. Based upon the reduction model, a 70% reduction in HC is necessary to meet POX (and for all practical purposes HC) ambient air standards. The percentage reductions predicted by BREIS are shown on a chart which the Regional Administrator, FHWA, attached to his consistency finding on August 9, 1974. The chart is attached as Appendix 5 to this opinion. In none of the alternatives did BREIS predict that the reduction of HC emissions would reach 70%, but it predicted net reductions of from 60.-6% to 65.9% for alternatives which included the Segment.

81. The "Policy Board" is defined by 23 C.F. R. § 770.201(e) as "that group of local officials, individuals, or representatives of agencies or organizations which has been designated by the state to provide policy guidance and direction in the conduct of the urban transportation planning process in an urbanized area." In the Baltimore region, the policy board is the Regional Planning Council.

82. 23 C.F.R. § 770.204(a)(3). Any significant deficiencies noted by the FHWA Regional Administrator in a degree of coordination in the planning process between planning for transportation and air quality planning are grounds for withholding 3–C Process planning certification under 23 U.S.C. § 134.

hicle inspection program as required by the Environmental Protection Agency promulgation. Further analysis to detail transportation control elements of the air quality plan and to determine the long range implications of several land use plan transportation alternatives has been initiated. This statement will be reviewed annually based on the latest available information to assure that the transportation programs are consistent with the air quality implementation plan for the Baltimore region. In addition, project level analysis as required by the Federal Highway Administration air quality guidelines and other federal and state regulations will be conducted to analyze in greater detail the air quality impact of specific transportation improvements."

The Transportation Steering Committee of the RPC was delegated the responsibility to act for RPC on the determination of consistency between the SIP and the transportation plans and programs. On June 26, 1974, the TSC found the regional transportation plans and programs and the SIP to be consistent.

The finding was based in part upon the BREIS Tech. Memo. No. 3, as amended and supplemented, but was also made after the solicitation of comments from BAQC as well as from other state and local air quality agencies. Nowhere in the RPC consistency statement was there a recitation of specific predicted levels of concentration of POX. Instead, reference was made to the fact that the BREIS *estimated* air quality levels, with and without projected highway components of the GDP, that these data were considered by RPC, and that RPC, in considering the BREIS air quality results, noted that no transportation control strategies[83] were assumed

to be in effect in the BREIS study. The RPC statement then went on:

"However, if *these elements*[84] *are assumed to be in effect, then* the following conclusions can be drawn:

"1. The carbon monoxide standard would be met by 1980 under all assumed highway alternatives even if the additional control elements are not considered.

"2. The photochemical oxidant standard would probably not be met by 1980 under any of the assumed highway alternatives. However, if additional use restrictions are taken into account, then the photochemical oxidant standard could be met by 1980.

"3. Under all assumed highway system assumptions, carbon monoxide (based on a reasonable level of analysis) and photochemical oxidant standards are projected to be met in the 20-year planning period, i. e., the year 1995.

"4. Under all assumed highway assumptions, nitrogen oxide standards are projected to be met in the 20-year planning period." · (Emphasis supplied).

In short, taken as a whole and in context, the RPC consistency finding, made in good faith, (1) recognized the hazards of predicting POX and HC concentrations under the existing state of the art, (2) acknowledged the generalized BREIS air quality predictions of substantial reductions in concentrations of air pollutants without assuming any transportation controls except the federal emission standards, (3) concluded, as did BREIS, that the implementation of transportation control strategies contemplated as part of the SIP would further reduce the levels of HC to allow the at-

---

83. Except the Federal motor vehicle emission controls.

84. *I. e.*, the transportation control strategies.

tainment of the POX and HC standards by 1995 and probably by 1980, (4) noted the continuing 3–C Process studies relating to the relationship of the transportation plan, including the 3–A System, and air quality, and (5) found, based upon all these considerations, that the transportation plan was "generally consistent" with the SIP, recognizing, however, that annual review in the light of the latest information available would be necessary to assure continued consistency of the plan with the SIP.

■ There appears to be no dispute that the technique of predicting a violation of POX and HC standards is of as yet empirically unverified validity at the lower levels of HC concentrations.[85] In fact, the EPA Administrator has expressed reservations concerning the adequacy of the proportional modeling technique to analyze accurately the impact of a single highway facility or project on ambient air concentrations of POX and $NO_2$, stating his intention in the near future to announce alternative methods for evaluating such impacts.[86] The uncertainty of the current methodology in predicting the exact degree of impact upon POX, HC, and $NO_2$ concentrations of relatively small degrees of emissions of HC and $NO_2$, combined with the fact that BREIS predicted reductions of HC emissions in 1980 and in 1995 approaching the required 70% in the "full build" alternatives and of $NO_2$ emissions in 1980 and 1995 exceeding the required percentage reduction without taking any credit for reductions which would be achieved based upon the implementation of transportation control strategies, together with the fact that the 3–A Highway System is being built in sections and a section-by-section analysis is anticipated to determine the air quality impact of spe-

cific proposed highway sections are factors that make it impossible for this court to conclude that the RPC committed a *clear* error of judgment in finding the transportation plan and program, as of June, 1974, consistent with the SIP. Even more is this so when due weight is given to the facts that continuing studies, previously partially enumerated herein, are being conducted on matters relevant to air quality in the Baltimore region and that the transportation plan is reviewed annually, if not constantly.

On August 13, 1974, the FHWA Regional Administrator wrote to the EPA Regional Administrator, noting that the final consistency determination made by the RPC had been made on June 26, 1974, and that after review by FHWA, he was of the opinion:

"There has been adequate coordination in the planning process between planning for transportation and air quality planning. The discussion of 'technical work scheduled for FY 1975 in the final consistency statement' indicates this coordination will continue and actually there probably will be increased coordination.

"The analyses indicate that the required hydrocarbon reductions cannot be achieved by 1977 without drastic measures such as gasoline rationing; however, with the use of control strategies, the required reductions can be obtained by 1980. The submission indicates implementation of the control strategies is under way.

"Based on the work that has been accomplished to date and the fact that additional work is to be undertaken, we believe the transportation planning process is adequate for certification purposes."

85. For an illustration of an acknowledgment of the scientific uncertainty in this area, see the discussion in State of Texas v. Environ-

mental Protection Agency, *supra*, 499 F.2d at 298–301.

86. 39 F.R. 25295 (July 9, 1974).

The comments of the Regional Administrator of EPA were solicited and a meeting between the two regional administrators was invited if felt desirable by the EPA Regional Administrator. On October 22, 1974, the EPA Regional Administrator replied to the aforesaid letter, disagreeing with certain of the FHWA Regional Administrator's conclusions and finding the transportation plan and program to be inconsistent in certain specified ways with the SIP. By letter of November 11, 1974, the Deputy Regional Administrator of FHWA replied and provided rational answers to the points raised in the letter of October 22, 1974.

■ Against this background, the court finds that the approval by the FHWA Regional Administrator of the Policy Board's consistency determination of the transportation plan and program with the SIP was made in good faith, considered the relevant factors, and cannot be said to constitute a *clear* error of judgment.

While this court has concluded that, under the applicable regulations, the mesoscale consistency analysis of a highway project is to be made as a part of the 3–C Process and is not required to be made by the Regional Administrator of the FHWA under 23 C.F.R. § 770.-204(b)(3)(iii), the fact is here that the Regional Administrator of FHWA did, even though not required so to do, make a mesoscale consistency determination. His determination was based in large part upon the mesoscale studies, as updated, set forth in the final printed version of BREIS Tech. Memo. No. 3. He specifically declined, however, to rely upon the BREIS predictions of HC and POX levels of concentration,[87] relying

instead upon the predicted percentage reductions of emissions. His mesoscale consistency finding of August 9, 1974, stated in pertinent part as follows:

"Although it is unlikely that the required 70% total overall reduction in hydrocarbon emissions will be achieved by 1977, the construction of the 3–A System will not interfere with reductions necessary to achieve or maintain the photo-chemical oxidant standard.

"By 1980 the 6 to 9 hydrocarbon emissions for motor vehicles will be reduced by 75% from the emission level in 1972. This deduction does not account for the implementation of the transportation control plan except for the federal motor vehicle control program (FMVCP).

"Overall hydrocarbon emissions should be further reduced through the implementation of controls on stationary sources such as gasoline handling and storage, which were not considered in the study.

. . . . . .

"The nitrogen oxide (NOx) emissions for motor vehicles will decline from 30% of the total NOx emissions in 1970 to 16% of the total in 1980 and to about 8% of the total in 1995 . . . . The Baltimore AQCR is classified Priority 3 for NOx which indicates that current levels of NOx are below the national standard."

The mesoscale consistency determination of the Regional Administrator of FHWA also noted that the BREIS Tech. Memo. No. 3 did not take into account the VMT reduction measures of the SIP and that these could be expected to produce reductions in the projected VMT

---

87. PX 228, "I–95 Baltimore, Caton Avenue to Russell Street, Consistency With SIP," ¶ 8. The Administrator also said in that paragraph: "The regional projections of photochemical oxidant levels for 1980 and 1995 given in BREIS Technical Memoran-dum No. 3 and in the I–95 Air Quality Assessment are tentative because of the uncertainty of projection methodology which relates hydrocarbon and nitrogen dioxide levels to the levels of photochemical oxidants."

which would, in turn, reduce the predicted hydrocarbon emissions.

■ The mesoscale consistency determination by the FHWA Regional Administrator, this court finds, was made by him after a good faith consideration of the relevant factors and does not constitute a *clear* error of judgment. While one might reasonably disagree with his conclusions, the responsibility for making policy decisions in this area does not rest with the court. It is not the court's function to substitute its judgment for that of the Regional Administrator of FHWA. Citizens to Preserve Overton Park, *supra*, 401 U.S. 416, 91 S.Ct. 814.

*Certification of the 3–C Process*

### VII

Plaintiffs have asserted that the so-called "3–C Process" for metropolitan Baltimore has not been recertified as required by law and that, therefore, no PS&E approvals for any portions of the challenged segment of I–95 could validly have been issued.

Under the provisions of 23 U.S.C. § 134:

" . . . the secretary shall not approve under section 105 of this title any program for projects in any urban area of more than fifty thousand population unless he finds that such projects are based on a continuing comprehensive transportation planning process carried on cooperatively by States and local communities in conformance with the objectives stated in this section.[88]

In Movement Against Destruction v. Volpe, *supra*, 361 F.Supp. at 1393–1396, this court previously held that FHWA, as the delegate of the Secretary of USDoT, properly certified in 1972 that there was a "3–C Process" in the Balti-

more region which satisfied the requirements of 23 U.S.C. § 134.

On July 11, 1973, the Acting Regional Federal Highway Administrator informed the Division Engineer that the 3–C Process for the Baltimore Urbanized Area was recertified.

On July 12, 1974, a memorandum from the Regional Administrator of FHWA to the Division Engineer of Region 3 granted an extension of the time for 3–C Process certification of the urbanized areas in the Region until August 15, 1974.[89] The reason for the extension was the delay in requests for recertification caused by the need of the urbanized areas to obtain air quality analyses, coordinate with the cognizant state air quality agencies, and obtain action by the policy boards under the new Interim Air Quality Guidelines, in addition to accomplishing the normal heavy workload preceding the beginning of a new fiscal year.

On August 12, 1974, the FHWA Regional Administrator informed the Division Engineer for Maryland that the Baltimore, Maryland Urbanized Area 3–C Process had been recertified, the recertification being conditional pending the resolution of any comments that might result from the consultation with EPA which is required by the Interim Air Quality Guidelines.[90]

On August 13, 1974, the Regional Federal Highway Administrator forwarded to the EPA Regional Administrator a copy of the air quality consistency submission for the Baltimore, Maryland Urbanized Area, noting a conclusion that there had been adequate coordination in the planning process between planning for transportation and planning for air quality. As the court has found in Part VI of this opinion, EPA replied to this letter, and the

---

88. In 1971, FHWA promulgated Instructional Memorandum (IM) 50–3–71 requiring the certification to be made annually (PX 245).

89. Plaintiffs do not contend there was a lapse of certification between July 1 and July 12, 1974.

90. 23 C.F.R. § 770.204(a)(3).

FHWA Regional Administrator in turn responded to EPA, affirming his earlier finding of consistency between the transportation plan and program of the Baltimore urban area and the SIP.

The actions of the Federal highway Administrator of Region 3 in extending the time for certification for a period of approximately one month and in conditionally certifying the 3–C Process for the Baltimore urban area was consistent with FHWA national policy, carried out in other Regions as well.

 The court has not had pointed out to it by counsel, nor has the court's independent research revealed, any statute or regulation prohibiting the procedures followed here in 1974 in postponing the time for certification, in the one case, and in conditionally certifying in the other case. The annual recertification procedure, not expressly mandated by 23 U.S.C. § 134(a), was begun by FHWA, under IM 50–3–71, as a management tool to help Regional Administrators improve the planning process in their respective regions. IM 50–3–71, not intended to be a formal regulation promulgated by the Secretary of Transportation and published in the Code of Federal Regulations pursuant to 23 U.S.C. § 315, does not in terms prohibit either an extension of time for certification nor a conditional certification. Where regulations or written procedures are either silent or ambiguous, great weight will be given to administrative custom and interpretation. Power Reactor Co. v. Electricians, 367 U.S. 396, 407–408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961).

 After conducting a substantial inquiry, the court is satisfied that all required procedures were complied with in the certification of the 3–C Process for the year beginning on July 1, 1974.

### VIII

No contention is made by the plaintiffs that the FHWA Regional Administrator exceeded the scope of his authority in certifying the Baltimore urban area 3–C Process. The court finds that the Regional Administrator's decision was within the scope of choices he could legally make and that he had sufficient information before him to have reasonably believed that the action he took was within the limits of his authority.

### IX

While admitting that the 3–C Process in the Baltimore urban area has all of the necessary component parts required by law, plaintiffs contend that the results of that process are so unreliable and so clearly in error as to render the decision of FHWA, through the Region 3 Administrator, a *clear* error of judgment in certifying it.

As a legal matter, the relationship of the results, in terms of specific plans produced, of the required comprehensive continuous and cooperative planning process to the required certification is not a direct one. The FHWA Regional Administrators do not directly regulate or approve the plans produced by the 3–C Process but instead examine the *process* itself to assure that the *process* is a comprehensive one, carried on continuously with reasonable reevaluations of prior plans, methods, conclusions, and assumptions, and is conducted with the cooperation of the responsible levels of state and local governments in the respective urban areas. While the "results" of the 3–C Process might be examined in a broad sense to determine whether the process was functioning with proper consideration for all the factors necessary to make the process comprehensive in nature or to determine whether the process was continuous and cooperative, the "results" are not examined pursuant to 23 U.S.C. § 134(a) for the purpose of directly approving them. The Federal Highway Administrator said it well in his introductory discussion of new regulations relating to environmental impact and related state-

ments, promulgated on December 2, 1974. He said:

> "Section 134 of Title 23 of the United States Code sets forth the Federal interest in being assured that the State and local governments cooperatively engage in a continuing, comprehensive transportation planning process (the '3C' process) which will assure that the transportation system ultimately developed will serve all jurisdictions efficiently and effectively. The Secretary of Transportation is directed to 'cooperate' in this process but he is not placed in control of the process. The Federal Government does not direct the adoption or take any part, either formally or informally, in the selection of any particular plan but merely reviews the planning process to assure that it is continuing, comprehensive and cooperatively undertaken. Various proposals included in a given plan may or may not ever surface in the form of Federal-aid projects." [91]

As a factual matter, in the previous parts of this opinion the court has found that the challenged methodologies and conclusions utilized in formulating or analyzing transportation plans and programs under the 3–C Process for the Baltimore urban area were within the state of the art. Accordingly there was no *clear* error on the part of the FHWA Regional Administrator when he determined that the 3–C Process was functioning in an appropriate and proper way.

This court finds that the decision of the Regional Administrator of FHWA, after a good faith consideration of the relevant factors, to certify the 3–C Process was a proper one under 23 U.S.C. § 134(a) and that he did not commit a clear error of judgment in making that determination.

### Conclusion

Plaintiffs have argued forcefully that the defendants or their agents used sci-

entifically inadequate methodologies and improper factors in the traffic and air quality predictions which form at least part of the foundation for their decisions. Defendants have contended that the techniques, methodologies, and factors utilized by them in the decisions made were at least within the state of the art. It is not the court's function to decide, as a matter of fact, which factor or methodology is the more scientifically correct, but to decide whether (1) there is any reasonable ground for the use of the factor or methodology used, (2) the factor or methodology used was used in good faith and not solely for justifying a preconceived result, and (3) the use of the factor or methodology produced a result which could have justified rationally the various decisions required to have been made under law. All these questions have been resolved in the defendants' favor.

In concluding that the plaintiffs cannot successfully challenge in this suit the construction of the segment of I–95 from Caton Avenue to Russell Street, the court does not intend to indicate a view one way or the other as to the wisdom or the legality of the future construction of other sections of the 3–A System of highways in Baltimore City. The wisdom of such construction is a matter beyond the jurisdiction of the court and rests appropriately with the elected officials of Baltimore City initially and secondarily with the various officals of the local, Maryland, and Federal governments in the exercise of their expertise in transportation planning and execution. The legality of such construction will await future political and administrative decisions, tested by statutes, regulations, and scientific knowledge then extant.

An appropriate order will be entered herein consistent with this opinion.

---

**91.** 39 F.R. 41804 at 41805.

## APPENDIX 1

TABLE II-1
BALTIMORE REGIONAL ENVIRONMENTAL IMPACT STUDY
EVALUATION OF SHORT-TERM (1980) EFFECTS

Column groups are numbered 1 (Existing), 5 (No 3-A), 4 (3-A Less Fort McHenry Crossing), 3 (Complete 3-A), repeated for three geographic groupings. The geographic label for each section is given in parentheses in the order: Group 1 / Group 2 / Group 3.

| Alternative | Existing (1) | No 3-A (5) | 3-A Less Fort McHenry Crossing (4) | Complete 3-A (3) | Existing (1) | No 3-A (5) | 3-A Less Fort McHenry Crossing (4) | Complete 3-A (3) | Existing (1) | No 3-A (5) | 3-A Less Fort McHenry Crossing (4) | Complete 3-A (3) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Socioeconomic** (Baltimore City / Suburban Counties / Region) | | | | | | | | | | | | |
| Population | 904,800 | 851,800 | 877,000 | 879,800 | 1,165,200 | 1,562,000 | 1,549,000 | 1,550,300 | 2,070,100 | 2,413,600 | 2,426,000 | 2,430,000 |
| Employment | 447,300 | 467,900 | 479,600 | 482,000 | 449,800 | 552,600 | 543,700 | 542,200 | 897,200 | 1,020,500 | 1,023,400 | 1,024,300 |
| Payrolls (millions of 1969 dollars) | 2,581 | 3,819 | 3,906 | 3,930 | 2,576 | 4,510 | 4,428 | 4,422 | 5,137 | 8,329 | 8,334 | 8,352 |
| Potential Retail Sales (millions of 1969 dollars) | 1,447 | 1,787 | 1,857 | 1,872 | 1,841 | 2,942 | 2,879 | 2,873 | 3,288 | 4,729 | 4,735 | 4,745 |
| **Transportation (24 Hours)** (Inside Beltway / Suburban Counties / BMATS Area) | | | | | | | | | | | | |
| Vehicle Miles of Travel (millions) | 5.9 | 6.7 | 7.2 | 7.3 | 12.0 | 18.9 | 18.7 | 19.8 | 17.8 | 25.6 | 26.0 | 26.0 |
| Vehicle Hours of Travel (thousands) | 299.0 | 359.0 | 334.0 | 324.0 | 487.0 | 805.0 | 785.0 | 784.0 | 788.0 | 1,165.0 | 1,120.0 | 1,108.0 |
| Percent Transit | | | | | | | | | 10.8 | 9.5 | 9.5 | 9.3 |
| **Air — Motor Vehicle Emissions (tons/year)** (Inside Beltway / Outside Beltway / BMATS Area) | | | | | | | | | | | | |
| – Carbon Monoxide | 618.1 | 181.3 | 184.0 | 183.3 | 382.4 | 160.9 | 160.3 | 159.8 | 1,010.5 | 342.2 | 344.3 | 343.1 |
| – Hydrocarbons | 128.9 | 28.4 | 27.4 | 26.3 | 74.4 | 21.3 | 23.0 | 21.1 | 201.3 | 47.7 | 50.4 | 47.4 |
| – Nitrogen Oxides | 59.9 | 27.7 | 29.2 | 29.4 | 44.7 | 27.2 | 27.2 | 27.0 | 104.6 | 54.9 | 56.4 | 56.4 |
| – Particulates | 3.2 | 1.5 | 1.5 | 1.6 | 2.3 | 1.4 | 1.4 | 1.4 | 5.5 | 2.9 | 2.9 | 3.0 |
| **Air Quality** | | | | | | | | | | | | |
| – Carbon Monoxide (ppm-1 hour) | – | – | – | – | – | – | – | – | 21.00 | 10.80 | 11.00 | 11.10 |
| – Carbon Monoxide (ppm-8 hours) | – | – | – | – | – | – | – | – | 17.00 | 7.20 | 7.40 | 7.40 |
| – Hydrocarbons (ppm) | – | – | – | – | – | – | – | – | 2.80 | 1.1 | 1.1 | 1.1 |
| – Photochemical Oxidants (ppm) | – | – | – | – | – | – | – | – | .21 | .09 | .09 | .09 |
| **Noise — Per Capita Noise Dosage (Hours in Excess of Standard)** (Baltimore City / Suburban Counties / BMATS Area) | | | | | | | | | | | | |
| – Residential | .348 | .339 | .348 | .347 | .012 | .025 | .024 | .024 | .186 | .160 | .166 | .186 |
| – Commercial | 1.753 | 1.874 | 2.015 | 2.077 | 1.374 | 1.566 | 1.572 | 1.565 | 1.631 | 1.765 | 1.838 | 1.863 |
| – Institutional | 1.661 | 1.738 | 3.109 | 1.985 | .254 | .271 | .273 | .272 | 1.024 | 0.924 | 2.253 | 1.023 |
| – Industrial | 1.338 | 1.468 | 1.569 | 1.635 | .319 | .570 | .565 | .565 | .887 | 1.132 | 1.183 | 1.216 |
| **Water & Solid Waste** (Baltimore System / Suburban Counties / Region) | | | | | | | | | | | | |
| Waste Water Flow (millions of gallons/day) | 169 | 214 | 217 | 218 | 82 | 103 | 101 | 101 | 251 | 317 | 318 | 319 |
| Water Needs (millions of gallons/day) | 229 | 278 | 283 | 284 | 68 | 100 | 97 | 97 | 297 | 378 | 380 | 381 |
| Solid Waste (thousands of tons/year) | 878 | 825 | 850 | 853 | 1,082 | 1,514 | 1,501 | 1,502 | 1,940 | 2,339 | 2,351 | 2,355 |
| **Ecology** (Baltimore City / Region / Region) | | | | | | | | | | | | |
| Population-Sensitivity Index (Geological, Physical, Biological) | 6 | 5 | 6 | 6 | 129 | 129 | 125 | 125 | 134 | 134 | 131 | 131 |

APPENDIX 2

BALTIMORE REGIONAL ENVIRONMENTAL IMPACT STUDY
TABLE II-2
EVALUATION OF LONG-TERM (1995) EFFECTS

**Baltimore City / Inside Beltway / Baltimore System / Baltimore City**

| Alternative | 1 Existing | 9 No 3-A No Other GDP Improvements | 8 Complete 3-A No Other GDP Improvements | 7 All GDP Improvements Except 3-A | 6 Complete 3-A and GDP Improvements |
|---|---|---|---|---|---|
| **Socioeconomic** | | | | | |
| Population | 904,900 | 978,200 | 1,031,800 | 860,800 | 906,300 |
| Employment | 447,300 | 557,900 | 606,500 | 533,100 | 583,900 |
| Payrolls (millions of 1959 dollars) | 2,561 | 8,479 | 7,045 | 6,527 | 7,170 |
| Potential Retail Sales (millions of 1959 dollars) | 1,447 | 2,435 | 2,617 | 2,320 | 2,558 |
| **Transportation (24 Hours)** | | | | | |
| Vehicle Miles of Travel (millions) | 5.9 | 7.7 | 8.7 | 7.2 | 8.0 |
| Vehicle Hours of Travel (thousands) | 299.0 | 488.0 | 449.0 | 383.0 | 359.0 |
| Percent Transit | | | | | |
| **Air — Motor Vehicle Emissions (tons/year)** | | | | | |
| - Carbon Monoxide | 618.1 | 87.1 | 91.8 | 85.0 | 89.6 |
| - Hydrocarbons | 126.9 | 14.1 | 15.3 | 13.8 | 14.4 |
| - Nitrogen Oxides | 59.9 | 14.2 | 15.1 | 14.1 | 14.8 |
| - Particulates | 3.2 | 1.7 | 1.8 | 1.7 | 1.6 |
| **Air Quality** | | | | | |
| - Carbon Monoxide (ppm-1 hour) | — | — | — | — | — |
| - Carbon Monoxide (ppm-8 hours) | — | — | — | — | — |
| - Hydrocarbons (ppm) | — | — | — | — | — |
| - Photochemical Oxidants (ppm) | — | — | — | — | — |
| **Noise — Per Capita Noise Dosage (Hours in Excess of Standard)** | | | | | |
| - Residential | .348 | .355 | .378 | .328 | .344 |
| - Commercial | 1.755 | 1.288 | 2.237 | 1.984 | 2.200 |
| - Institutional | 1.681 | 1.759 | 1.994 | 1.763 | 1.993 |
| - Industrial | 1.338 | 1.543 | 1.709 | 1.518 | 1.675 |
| **Water & Solid Waste** | | | | | |
| Waste Water Flow (millions of gallons/day) | 169 | 282 | 276 | 254 | 284 |
| Water Needs (millions of gallons/day) | 228 | 383 | 396 | 365 | 402 |
| Solid Waste (thousands of tons/year) | 878 | 946 | 1,000 | 834 | 878 |
| **Ecology** | | | | | |
| Population-Sensitivity Index (Geological, Physical, Biological) | | 11 | 13 | 5 | 7 |

**Suburban Counties / Outside Beltway / Suburban Counties**

| Alternative | 1 Existing | 9 No 3-A No Other GDP Improvements | 8 Complete 3-A No Other GDP Improvements | 7 All GDP Improvements Except 3-A | 6 Complete 3-A and GDP Improvements |
|---|---|---|---|---|---|
| **Socioeconomic** | | | | | |
| Population | 1,185,200 | 1,774,300 | 1,833,400 | 2,070,300 | 2,118,400 |
| Employment | 449,800 | 659,400 | 659,800 | 722,800 | 709,100 |
| Payrolls | 2,576 | 7,658 | 7,664 | 8,850 | 8,708 |
| Potential Retail Sales | 1,841 | 4,272 | 4,372 | 4,893 | 4,899 |
| **Transportation** | | | | | |
| Vehicle Miles of Travel | 12.0 | 20.9 | 21.5 | 25.6 | 26.1 |
| Vehicle Hours of Travel | 487.0 | 1,105.0 | 1,175.0 | 954.0 | 987.0 |
| Percent Transit | | | | | |
| **Air — Motor Vehicle Emissions** | | | | | |
| - Carbon Monoxide | 302.4 | 82.0 | 84.5 | 90.7 | 101.3 |
| - Hydrocarbons | 74.4 | 12.5 | 12.5 | 14.1 | 15.2 |
| - Nitrogen Oxides | 44.7 | 13.4 | 13.9 | 16.8 | 17.3 |
| - Particulates | 2.3 | 1.6 | 1.6 | 2.0 | 2.0 |
| **Air Quality** | — | — | — | — | — |
| **Noise** | | | | | |
| - Residential | .012 | .028 | .032 | .040 | .043 |
| - Commercial | 1.374 | 1.506 | 1.591 | 2.087 | 2.141 |
| - Institutional | .254 | .258 | .287 | .314 | .313 |
| - Industrial | .319 | .507 | .522 | .697 | .690 |
| **Water & Solid Waste** | | | | | |
| Waste Water Flow | 82 | 132 | 134 | 161 | 161 |
| Water Needs | 88 | 90 | 106 | 128 | 122 |
| Solid Waste | 1,062 | 1,719 | 1,777 | 1,006 | 1,053 |
| **Ecology** | | | | | |
| Population-Sensitivity Index | | 186 | 182 | 216 | 219 |

**Region / BMATS Area / BMATS Area / BMATS Area / Region / Region**

| Alternative | 1 Existing | 9 No 3-A No Other GDP Improvements | 8 Complete 3-A No Other GDP Improvements | 7 All GDP Improvements Except 3-A | 6 Complete 3-A and GDP Improvements |
|---|---|---|---|---|---|
| **Socioeconomic** | | | | | |
| Population | 2,070,100 | 2,752,500 | 2,805,200 | 2,930,900 | 3,024,790 |
| Employment | 897,200 | 1,217,200 | 1,266,400 | 1,255,900 | 1,293,000 |
| Payrolls | 5,137 | 14,137 | 14,709 | 15,377 | 15,878 |
| Potential Retail Sales | 3,288 | 6,707 | 6,889 | 7,213 | 7,457 |
| **Transportation** | | | | | |
| Vehicle Miles of Travel | 17.8 | 28.8 | 30.2 | 32.8 | 34.1 |
| Vehicle Hours of Travel | 786.0 | 1,591.0 | 1,624.0 | 1,337.0 | 1,325.0 |
| Percent Transit | 10.8 | 11.9 | 12.0 | 10.6 | 10.9 |
| **Air — Motor Vehicle Emissions** | | | | | |
| - Carbon Monoxide | 1,010.5 | 189.1 | 176.1 | 185.7 | 190.9 |
| - Hydrocarbons | 201.3 | 26.6 | 27.8 | 27.9 | 29.6 |
| - Nitrogen Oxides | 104.8 | 27.6 | 28.0 | 30.9 | 32.1 |
| - Particulates | 5.5 | 3.3 | 3.4 | 3.7 | 3.8 |
| **Air Quality** | | | | | |
| - Carbon Monoxide (ppm-1 hour) | 21.00 | 7.20 | 7.40 | 6.50 | 8.40 |
| - Carbon Monoxide (ppm-8 hours) | 17.00 | 4.80 | 5.00 | 6.40 | 6.10 |
| - Hydrocarbons (ppm) | 2.80 | .90 | 1.0 | 1.0 | 1.0 |
| - Photochemical Oxidants (ppm) | .21 | .06 | .08 | .08 | .08 |
| **Noise** | | | | | |
| - Residential | .185 | .168 | .180 | .143 | .153 |
| - Commercial | 1.631 | 1.791 | 1.916 | 2.074 | 2.185 |
| - Institutional | 1.024 | .934 | 1.041 | .946 | 1.049 |
| - Industrial | .987 | 1.113 | 1.219 | 1.189 | 1.271 |
| **Water & Solid Waste** | | | | | |
| Waste Water Flow | 251 | 394 | 410 | 415 | 425 |
| Water Needs | 297 | 482 | 502 | 508 | 524 |
| Solid Waste | 1,840 | 2,687 | 2,777 | 2,840 | 2,931 |
| **Ecology** | | | | | |
| Population-Sensitivity Index | | 177 | 195 | 221 | 226 |

APPENDIX 3

Table VI - 16

PREDICTED MAXIMUM ONE-HOUR CO CONCENTRATIONS
AT SELECTED RECEPTOR POINTS

Maximum One-Hour CO Concentration, ppm*

| Receptor<br>Year/Alternative | AIRMON 1<br>(1) | AIRMON 2<br>(2) | Riviera Beach<br>(3) | Linthicum<br>(4) | Towson<br>(5) | Timonium<br>(7) | Robinson & Toone<br>(8) | Hamilton<br>(9) | Nottingham<br>(10) | Garrison<br>(11) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1980 - Alternative 3 - Complete 3-A | 4.3 | 3.9 | 3.0 | 8.2 | 5.4 | 7.7 | 5.8 | 5.9 | 11.1 | 4.5 |
| 1980 - Alternative 4 - 3-A, less Ft. McHenry Crossing | 4.5 | 4.2 | 3.3 | 7.0 | 5.4 | 7.7 | 7.4 | 6.0 | 11.0 | 3.7 |
| 1980 - Alternative 5 - No 3-A | 4.9 | 4.9 | 3.2 | 8.3 | 5.8 | 8.4 | 6.2 | 6.2 | 10.8 | 4.7 |
| 1995 - Alternative 6 - Complete 3-A and GDP Improvements | 3.3 | 2.9 | 3.4 | 5.5 | 4.1 | 4.8 | 3.6 | 3.6 | 6.4 | 3.2 |
| 1995 - Alternative 7 - No 3-A, All GDP Improvements | 3.4 | 3.0 | 3.0 | 5.6 | 4.3 | 4.8 | 4.4 | 3.5 | 6.5 | 2.8 |
| 1995 - Alternative 8 - Complete 3-A, No GDP Improvements | 3.2 | 2.9 | 2.8 | 3.0 | 4.1 | 5.4 | 3.9 | 3.7 | 7.4 | 3.8 |
| 1995 - Alternative 9 - No 3-A, No GDP Improvements | 3.4 | 3.1 | 2.4 | 3.0 | 4.2 | 5.2 | 4.4 | 3.6 | 7.2 | 3.7 |

* Predicted maximum 8-hour CO centrations are all in the range of 58 to 67 percent of the maximum one-hour concentrations. This uniformity results from the use of identical meterological data for all alternatives and similar patterns of percent of total daily traffic by hour input for all roadways in the study area.

Table II - 2

MAXIMUM PREDICTED REGIONAL POLLUTANT CONCENTRATIONS

| Pollutant | Averaging Time | 1980 | | Alternative 5 No 3-A | 1995 | | | | National Air Quality Standard |
|---|---|---|---|---|---|---|---|---|---|
| | | Alternative 3 Complete 3-A | Alternative 4 3-A less Ft. McHenry Crossing | | Alternative 6 Complete 3-A and GDP Improvements | Alternative 7 No 3-A, All Other GDP Improvements | Alternative 8 Complete 3-A, No Other GDP Improvements | Alternative 9 No 3-A or GDP Improvements | |
| Carbon Monoxide (ppm) | 1-hour maximum | 11.1 | 11.1 | 10.8 | 6.4 | 6.5 | 7.4 | 7.2 | 35 ppm |
| | 8-hour maximum | 7.4 | 7.4 | 7.2 | 4.3 | 4.4 | 5.0 | 4.8 | 9 ppm |
| Non-Methane Hydrocarbons (ppm) | 3-hour maximum (6-9 a.m.) | 1.1 | 1.1 | 1.1 | 1.0 | 1.0 | 1.0 | 0.9 | 0.24 ppm |
| Photochemical Oxidants (ppm) | 1-hour maximum | 0.09 | 0.09 | 0.09 | 0.08 | 0.08 | 0.08 | 0.08 | 0.08 ppm |
| Nitrogen Dioxide (ppm) | annual arithmetic mean | 0.05 | 0.05 | 0.05 | 0.06 | 0.06 | 0.06 | 0.06 | 0.05 ppm |
| Particulate Matter ($\mu g/m^3$) | annual geometric mean | 59.0 | 59.0 | 59.0 | 63.0 | 63.0 | 63.0 | 63.0 | primary-- 75 $\mu g/m^3$ secondary-- 60 $\mu g/m^3$ |

\* All predicted values based on 1972 air-quality data collected at AIRMON 1 and 2 stations. A new standard method for $NO_x$ measurement may change the observed levels at these stations.

\*\* Proportional model calculations assume the 123 $\mu g/m^3$ arithmetic mean at the maximum site used in the implementation plan and a 40 $\mu g/m^3$ background. Conversion to geometric mean was with the assumption that the geometric standard deviation equals 1.6.

Note: Does not include estimates of the effects of transportation control strategies and controls on certain stationary sources issued after September, 1973.

## APPENDIX 5

COMPARISON OF MOTOR VEHICLE WITH STATIONARY & OTHER TRANSPORTATION HC EMISSIONS
(Tabulation Extracted from Table VI-18 on Page VI-47 of ERIES Technical Memorandum No. 3)

| | 1970 | 1980 | | | 1995 | | | |
|---|---|---|---|---|---|---|---|---|
| | ALT. 1 | ALT. 3 | ALT. 4 | ALT. 5 | ALT. 6 | ALT. 7 | ALT. 8 | ALT. 9 |
| Motor Vehicle (tons) | 50.33* (47.5)* | 11.85 | 12.6 | 11.93 | 7.4 | 6.98 | 6.9 | 6.65 |
| Stationary & Other Transportation (tons) | 14.68 (13.5) | 12.99 | 13.0 | 12.94 | 15.9 | 15.62 | 15.3 | 14.98 |
| Motor Vehicle Percent HC Reduction | -------- | 76.4 (75.0) | 75.0 (73.5) | 76.3 (74.9) | 85.3 (84.4) | 86.1 (85.3) | 86.3 (85.5) | 86.8 (85.9) |
| Stationary & Other Transportation Percent HC Reduction or Increase | | 11.5 (3.8) | 11.44 (3.7) | 11.85 (4.15) | +8.3 (+17.8) | +6.4 (+15.7) | +4.22 (+13.3) | +2.04 (+10.96) |
| | | % Reduction | | | % Increase | | | |
| Total HC Percent Reduction (Mobile & Stationary) | | 61.8 (59.3) | 60.6 (58.0) | 61.7 (59.2) | 64.2 (61.8) | 65.1 (63.0) | 65.9 (63.6) | 66.7 (64.5) |

*Numbers within parentheses represent calculations based on 1972 hydrocarbon emissions for 6 to 9 a.m. period as given in EPA's Transportation Control Plan for the Baltimore region. The calculations in Table VI-18 of ERIES are based on a 1970 BAQC emission inventory.

## APPENDIX 6

### List of Abbreviations

| | |
|---|---|
| ADT | Average Daily Traffic |
| AMV | Alan M. Voorhees Associates |
| AQCR | Air Quality Control Region |
| BAQC | Bureau of Air Quality Control, an agency of the Department of Health & Mental Hygiene, State of Maryland |
| BMATS | Baltimore Metropolitan Area Transportation Study |
| BREIS | Baltimore Regional Environmental Impact Statement |
| CEQ | Council on Environment Quality of U. S. |
| CO | Carbon Monoxide |
| EIS | Environment Impact Statement |
| EPA | Environmental Protection Agency |
| FHWA | Federal Highway Administration, an agency of the USDoT |
| GDP | General Development Plan |
| HC | Hydrocarbons |
| IDBC | Interstate Division for Baltimore City, a division of SHA of Maryland DoT |
| IM | Instructional Memorandum |
| Maryland DoT | Department of Transportation, State of Maryland |
| NEPA | National Environmental Policy Act |
| $NO_2$ | Nitrogen dioxide |
| NOx | Nitrogen oxides (unspecified) |
| POX | Photochemical oxidants |
| PPM | Policy and Procedure Memorandum |
| p.p.m. | Parts per million |
| PS & E | Plans, Specifications, and Estimates |
| RPC | Regional Planning Council of the Baltimore Metropolitan Region, including five counties as well the City |
| SHA | Interchangeably, the former State Roads Commission of Maryland and State Highway Administration, an agency of Maryland DoT |
| SIP | State Implementation Plan |
| $SO_2$ | Sulphur dioxide |
| TES | Assistant Secretary of USDoT for Environment, Safety and Consumer Affairs |
| TEU | Office of Environment and Urban Assistance of USDoT |
| TSC | Transportation Steering Committee |
| USDoT | United States Department of Transportation |
| VMT | Vehicle miles traveled |